211 P.3d 448 (2009)
STATE of Washington, Appellant,
v.
R.J. REYNOLDS TOBACCO COMPANY, Respondent.
No. 61873-3-I.
Court of Appeals of Washington, Division 1.
July 13, 2009.
*449 Rene D. Tomisser, Office of the Attorney General, Olympia, WA, for Appellant.
Bradley S. Keller, Attorney at Law, Seattle, WA, for Respondent.
ELLINGTON, J.
¶ 1 After extensive national litigation, R.J. Reynolds Tobacco Company (Reynolds) and other cigarette manufacturers entered into a master settlement agreement with 46 states, including Washington. Stipulated consent decrees were entered in each state. The agreement contains a strict prohibition against the use of cartoons in advertising tobacco products. The chief question here is whether a Reynolds advertisement in the November 15, 2007 edition of Rolling Stone violated this prohibition. A secondary question is whether Reynolds had a duty to ensure the adjacent content within the magazine did not violate the cartoon prohibition.
¶ 2 The trial court ruled the Reynolds advertisement did not violate the cartoon ban and that Reynolds did not cause Rolling Stone's use of cartoons in the editorial content enfolded by the advertisement. The court also ruled that because the Rolling Stone cartoon material was unforeseeable, Reynolds had no duty to prohibit its use.
¶ 3 The State appeals. We affirm the ruling that Reynolds is not liable for the Rolling Stone content. But we hold that Reynolds' advertisement violated the settlement agreement. We therefore reverse.

BACKGROUND
¶ 4 In November 1998, the attorneys general of 46 states reached a landmark agreement with major manufacturers in the cigarette industry, including Reynolds.[1] The signatory states settled their claims against these companies in exchange for monetary payments and permanent injunctive relief. The injunction includes a "Ban on the Use of Cartoons"[2] that prohibits the cigarette companies from advertising or promoting tobacco products using cartoons, as defined by the master settlement agreement (MSA).
¶ 5 In approximately 2006, Reynolds began an advertising campaign known as the Camel Farm promotion, aimed at fans of rock music. The campaign uses an agricultural theme to make a metaphorical connection between the Camel Farm and bringing independent music up from the underground. As part of the campaign, Reynolds sponsored performances around the country by regional bands, distributed a DVD with their music, launched a Camel Farm web site (TheFarmRocks.com) promoting "free range" music,[3] and sent e-mails or direct mail to adult smokers on its consumer database.
*450 ¶ 6 In late 2006, Rolling Stone magazine approached Reynolds about placing a high impact gatefold advertisement in the last of three special fortieth anniversary issues. Believing that its independent music theme was a good fit with the third issue's focus on the future of music, representatives from Reynolds met with counterparts from Rolling Stone to discuss the proposal. Reynolds representatives were shown a gatefold advertisement for Patron tequila from the first of the anniversary issues, which opened out to reveal a Rolling Stone editorial on 40 influential songs. Reynolds purchased four pages of gatefold format advertising in the November 15, 2007 issue of the magazine.
¶ 7 On each page of the ad, the lower third is a green field. The first page depicts the head and shoulders of a woman with a "retro" hairstyle. She is surrounded by flowers and a floating gramophone with a butterfly in its fluted speaker and a bird sitting next to the wind-up arm. A second bird perches on the extended forefinger of a disembodied hand emerging from beneath the turntable. The Camel logo is above, and a banner below announces "Welcome to The Farm."[4]
¶ 8 The adjacent page is editorial content from Rolling Stone announcing a special foldout inside. It consists of a facsimile of a spiral notebook cover entitled "Indie Rock Universe, An Alternate Dimension Where Everyone Wears Black Converse."[5]
¶ 9 The gatefold pages are next. They consist of photographic images assembled to depict a surreal pastoral scene with a retro look. A woman drives a tractor that appears to float. A rooster rides on top, with a bird on his back. The gramophone hovers nearby. The woman on the tractor looks about the same size as the hitchhiking rooster, and the tractor has enormous film reels for wheels and a telephoto camera lens protruding from the engine. Old style audio speakers, a television and radios (one with helicopter rotors) appear to grow on plant stalks. In the blue sky above, another radio with helicopter blades appears to fly above an eagle carrying a picture frame through which a human hand protrudes.
¶ 10 Above these images is the Camel logo and the heading "The Farm Free Range Music, Committed To Supporting And Promoting Independent Record Labels."[6] To the side, under a banner titled "The Best Music Rises From The Underground," appears the following:
The world of independent music is constantly changing. New styles and sounds emerge daily. That's why we're bringing you The FARM. A collaboration between Camel and independent artists and record labels. It's our way of supporting these innovators as they rise up to bring their sounds to the surface. We give them more opportunities to be heard through online music and countless events across the nation.
Visit TheFarmRocks.com
Free shows, great bands and more![[7]]
¶ 11 These pages open butterfly style to reveal four pages of the "Indie Rock Universe" foldout, which consists of drawings categorizing indie artists and bands prepared for Rolling Stone by illustrator Benjamin Marra. The illustrations include a rocket powered audio speaker, a planet with human features, a robot playing a guitar, and a headless, armless bagpipe.[8]
¶ 12 Closing the foldout and turning the page reveals the last page of the Camel Farm advertisement, which depicts the rooster, a pointing man, and a banner stating "For The Best New Sounds Visit TheFarmRocks.com."[9]
¶ 13 The Rolling Stone advertisement prompted immediate litigation around the country,[10] including this action filed by the *451 State of Washington seeking to enforce the MSA by way of injunctive relief and sanctions. The State alleges the advertisement violated the cartoon ban and also contends Reynolds violated the agreement by permitting Rolling Stone to use cartoon material inside the gatefold.
¶ 14 The court rejected the State's request for sanctions of $100 per issue of the magazine as constituting punitive damages not available in Washington. Trial was had on the question of whether the advertisement or the adjacent editorial content violated the MSA. The court ruled that Reynolds' Camel Farm advertisement did not contain prohibited cartoons, and that because Reynolds could not have foreseen that the Rolling Stone editorial content would include cartoons, Reynolds did not violate the MSA by failing to prevent the improper adjacent material. The court warned Reynolds, however, that in future, lack of foreseeability would not be a viable defense and Reynolds would be held to answer for "a similar layout of advertisement and cartoon content."[11]
¶ 15 The State appeals.

ANALYSIS
¶ 16 The MSA contains a strict prohibition against the use of cartoons in cigarette advertising, and the consent decree includes a permanent injunction. The MSA defines "cartoon" as follows:
(1) "Cartoon" means any drawing or other depiction of an object, person, animal, creature or any similar caricature that satisfies any of the following criteria:
(1) the use of comically exaggerated features;
(2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or
(3) the attribution of unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation.[[12]]
¶ 17 The trial court found it "arguable" that the Camel Farm advertisement violated the cartoon ban. Ultimately however, the court concluded it did not:
[T]he court has been asked to (and will) apply two devices not normally associated with cartoons: common sense and the doctrine of ejusdem generis. The ban on the use of cartoons in tobacco ads is rooted in the allure that traditional cartoons hold for children. Instead of humor, cuteness or gee-whiz wonder, the images before the court employ a simplistic but rather more thought-provoking metaphor regarding the growth and nurturance of artistic creativity. They are as different from the sunglasses-wearing, saxophone-playing, comically hip Joe Camel as Renee Magritte is from Walt Disney. The Court would find that the photographic images in the RJR-prepared ad campaign do not constitute cartoons.[[13]]
The State contends the trial court effectively ignored the MSA's definition and substituted its own.
¶ 18 A consent decree has a contractual nature; therefore, contract principles of construction apply.[14] The touchstone of contract interpretation is the intention of the parties,[15] which Washington courts attempt *452 to determine by focusing on the objective manifestations of agreement.[16] We give words their ordinary, usual, and popular meaning unless the entirety of the agreement evidences a contrary intent.[17] If relevant for determining mutual intent, surrounding circumstances and other extrinsic evidence may be used to determine the meaning of specific words and terms used, but not to show an intention independent of the instrument or to vary, contradict or modify the written word.[18] Where, as here, interpretation does not depend on the use of extrinsic evidence, interpretation of a contract provision is a question of law[19] reviewed de novo.[20]
¶ 19 The parties center their arguments on the third paragraph of the definition,[21] which prohibits the "attribution of unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation."[22] Reynolds argues the phrase "unnatural or extrahuman abilities" is ambiguous and that under the doctrine of ejusdem generis,[23] its meaning should be restricted to superhero-like powers that defy the laws of science.
¶ 20 But ejusdem generis is little help, because the enumerations are not easily classified. The MSA definition does not confine its examples to superhuman powers. Cartoons include any depiction attributing unnatural abilities "such as ... transformation."[24] Radios and televisions and speakers do not naturally fly through the air or grow out of the ground like flowers. Tractors do not naturally float. The plain and ordinary meaning of "transformation" is "an act, process, or instance of transforming or being transformed... a physiological change of one thing into another."[25] The Camel Farm radios have become crops and aircraft. Were these depictions graphic, rather than photographic, we doubt there would be much debate about whether they are cartoons within the MSA definition.
¶ 21 We agree with the trial court that the Camel Farm photo collage does not resemble traditional Disney cartoons, but this is not germane. Disney-type cartoons were not the only target of the prohibition. Nor is it germane that the effect is thought-provoking rather than humorous.
¶ 22 The settlement agreement definition is deliberately broad. Images in the Camel Farm photo collage violate the plain language of the MSA.
¶ 23 Even were we to turn, as the trial court did, to consider the intent of the agreement, it is plain that one focus of the MSA is to prohibit the marketing of tobacco products by the use of unnatural images. The Camel *453 Farm imagery depends entirely upon suspension of the laws of nature. Under a blue sky in a pastoral Eden, roosters hitch rides on floating tractors, speakers grow out of the ground, and radios fly. This is in a world where the natural laws do not obtain, where cancer and serious health problems can cease to exist. For a product known to cause both, such a world is a potent sales device.
¶ 24 Further, the MSA prohibits marketing targeted at people under 18.[26] The cartoon ban is therefore aimed in part at preventing advertisements that will attract underage readers of adult media. This is not the Disney cartoon age group. Rolling Stone's readership is sure to include many young people, especially for an issue focusing on independent music.
¶ 25 The MSA prohibits the depiction of unnatural abilities such as transformation, and we cannot see how else to describe the imagery in the Camel Farm advertisement. The ad violated the MSA.

Rolling Stone's Indie Rock Universe
¶ 26 The consent decree issued in conjunction with the MSA imposed a permanent injunction against "using or causing to be used ... any Cartoon"[27] in promoting tobacco products. The trial court found that Reynolds did not desire, did not know, and could not reasonably foresee that the material enfolded by its gatefold advertisement would include cartoons. The court ruled that Reynolds did not affirmatively cause Rolling Stone's use of cartoons, and that the use of cartoons was not sufficiently foreseeable that failure to prevent it could be considered the equivalent of causing it. The court therefore concluded Reynolds did not violate the cartoon ban by way of Rolling Stone's Indie Rock Universe.
¶ 27 The State contends that Reynolds' duty to prevent cartoons from being used in its advertising includes a duty to prevent their use in integrated content such as the Indie Rock Universe. The State does not challenge the findings of fact, so we consider only whether the findings support the conclusions.[28]
¶ 28 Reynolds did not affirmatively cause Rolling Stone's use of cartoons. The State contends however, that Reynolds is avoiding compliance with the MSA "by using a third party who is unaware of the terms of the injunction,"[29] and that Reynolds had an affirmative duty to inform Rolling Stone about the cartoon ban.[30] The State points to Rolling Stone's statement that it would have obeyed an instruction not to place the advertisement adjacent to editorial content containing cartoons. The State also points to the limits Reynolds placed on adjacent content in its insertion order[31] (e.g., no "adjacent antithetical editorial"[32]) and argues that Reynolds could have used its order to prevent any possibility of violation of the MSA.
¶ 29 No provision of the MSA or the consent decree applies to or imposes restrictions upon third parties. Reynolds did not prepare, preview, or pay for the five pages of Indie Rock Universe content. The court's unchallenged finding is that
it is beyond dispute that [Reynolds] had no intent for that ad to enfold a cartoon, no knowledge that it would do so, and, in fact, had been shown examples of previous gatefolds that led it to assume that only traditional text and photographs would appear there. At the time the ad space was purchased, it was understood that the enclosed content would address the subject of independent music but, given the separation between editorial and advertising staffs as well as their differing deadlines, *454 the way in which this would be done was both unknown and unknowable.[[33]]
¶ 30 The State contends Reynolds' duty is absolute and foreseeability is irrelevant. But absent a reasonable foreseeability that Rolling Stone would use cartoons, it does not follow that Reynolds had a duty to include a cartoon restriction in its insertion order. Inside the Patron tequila gatefold shown to Reynolds, the Rolling Stone content consisted of traditional text and photographic material. Given the unchallenged findings of fact, we agree with the trial court's conclusion that Reynolds' failure to prevent the use of cartoons in Rolling Stone's copy did not amount to causing the gatefold to include cartoons.[34] We also agree with the trial court, however, that lack of foreseeability will not be available as a defense in future where adjacent or integrated content violates the MSA.

Damages and Attorney Fees
¶ 31 The State has stipulated that, although it was injured by Reynolds' alleged violation of the consent decree, it "does not contend, and will not introduce any evidence, that the State, or any resident of the State, suffered any specific, compensable harm as a result of the publication of the Camel Farm ad in the November 15, 2007 Fortieth Anniversary issue of Rolling Stone."[35]
¶ 32 The trial court granted Reynolds' motion to strike the State's request for relief of $100 per each issue of the November 15, 2007 Rolling Stone magazine, finding that the damages requested are punitive. The State does not appeal that order. Because the court rejected the State's theories of liability, however, it did not consider what remedy is appropriate for Reynolds' violation of the cartoon ban. We therefore remand for the court to address the issue of remedies and to award the State its attorney fees, below and on appeal.[36]
¶ 33 Affirmed in part, reversed in part, remanded.
I CONCUR: BECKER, J.
CONCURRING IN THE RESULT ONLY: GROSSE, J.
NOTES
[1] Reynolds is a defendant under the consent decree entered in King County Superior Court on November 23,1998.
[2] Ex. 103, § III(b).
[3] The web site was apparently closed in 2007.
[4] ROLLING STONE, Nov. 15, 2007, at 64.
[5] Id. at 65.
[6] Id. at 66, 71.
[7] Id. at 71.
[8] It is undisputed that this material contains cartoons as defined by the MSA.
[9] ROLLING STONE, Nov. 15, 2007, at 72.
[10] We are aware of suits filed by the States of Maine (Kennebec Superior Court No. CV-97-134), Ohio (Franklin County Court of Common Pleas No. 97 CVH 05-5114), California (San Diego County Superior Court No. JCCP 4041), Illinois (Cook County Circuit Court No. 96 L 13146), Maryland (Baltimore Circuit Court No. 96122017/CL211487), Pennsylvania (Philadelphia Court of Common Pleas No. 2443), and Connecticut (Hartford Superior Court No. CV96-0148414). The Maine and Ohio courts held that the advertisement does not contain cartoons. The California court held that the advertisement contains cartoons, but that Reynolds did not violate the MSA by failing to prevent cartoons in adjacent Rolling Stone content. The Pennsylvania court held that the Camel Farm advertisement contained cartoons, that the entire section consisted of integrated content, and that Reynolds violated its duty to ensure its advertisement was not linked with other cartoon content.
[11] Clerk's Papers at 605.
[12] Ex. 103, § II(l).
[13] Id.
[14] ITT Rayonier, Inc. v. Washington Dep't of Ecology, 91 Wash.2d 682, 687, 586 P.2d 1155 (1978); State v. John, 69 Wash.App. 615, 620, 849 P.2d 1268 (1993).
[15] U.S. Life Credit Life Ins. Co. v. Williams, 129 Wash.2d 565, 569, 919 P.2d 594 (1996).
[16] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wash.2d 493, 503, 115 P.3d 262 (2005).
[17] Id. at 504, 115 P.3d 262.
[18] Id. at 503, 115 P.3d 262.
[19] Tanner Elec. Co-op. v. Puget Sound Power & Light Co., 128 Wash.2d 656, 674, 911 P.2d 1301 (1996).
[20] Tapper v. State Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993); see also Hogan v. Sacred Heart Med. Ctr., 101 Wash.App. 43, 49, 2 P.3d 968 (2000).
[21] Reynolds also argues that the attorneys general of several states, including Washington, failed to express concerns regarding the cartoon ban in an August 15, 2007 letter or an October 16, 2007 meeting, both on the topic of the Camel Farm campaign. But the letter and the meeting were focused on whether the Camel Farm direct mailing campaign targeted youth or violated the MSA's ban on tobacco brand name merchandise. Further, the advertisement under review at that time included the image of a woman driving a tractor with film reel wheels, but not images of radios or speakers growing out of the ground on plant stalks.
[22] Ex. 103, § II(l).
[23] The doctrine of ejusdem generis provides that when a general term follows or is preceded by a series of specific terms, the general term should not be given its broadest possible meaning, but rather should extend only to matters of the same general class or nature as the terms specifically enumerated. Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 590-91, 964 P.2d 1173 (1998). The doctrine applies in both statutory and contract interpretation cases. See Lombardo v. Pierson, 121 Wash.2d 577, 583, 852 P.2d 308 (1993); State v. Stockton, 97 Wash.2d 528, 532, 647 P.2d 21 (1982).
[24] Ex. 103, § II(l).
[25] WEBSTER'S THIRD NEW INT'L DICTIONARY 2427 (1993).
[26] See Ex. 103, § III(a).
[27] Ex. 104, § V.B.
[28] State v. Rodgers, 146 Wash.2d 55, 61, 43 P.3d 1 (2002).
[29] Br. of Appellant at 30.
[30] The State also contends that Reynolds acted in concert with, or was, participating with Rolling Stone to produce the gatefold. The State raises this argument for the first time on appeal, and we decline to address it. RAP 2.5(a); Brundridge v. Fluor Fed. Servs., Inc., 164 Wash.2d 432, 441, 191 P.3d 879 (2008).
[31] An insertion order is the mechanism used for placing an ad in a magazine.
[32] Ex. 28.
[33] Clerk's Papers at 602-03.
[34] The court did not decide whether the Camel Farm advertisement and the Indie Rock Universe form an integrated cigarette advertisement. Because we agree with the court's conclusion that Reynolds did not "cause" Rolling Stone's use of cartoons but find that Reynolds' advertisement violated the MSA, we need not address this issue.
[35] Clerk's Papers at 378.
[36] A signatory state is entitled to its costs and attorney fees if the proceeding results in a finding that a cigarette manufacturer violated the consent decree.