[No. 27268-1-III.  Division Three.  October 22, 2009.]

PAMELA L. MYERS, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Kevin L. Johnson* (of *Kevin L. Johnson, PS*), for appellant.

*Robert M. McKenna, Attorney General*, and *Carl P. Warring, Assistant*, for respondent.

¶1 SWEENEY, J. — This appeal follows the summary dismissal of an action for wrongful termination of a contract for an in-home caregiver by the Department of Social and Health Services (DSHS). DSHS terminated the contract after an investigator concluded that the caregiver was guilty of neglect. Later appeals tribunals reversed the finding of neglect. But the contract also authorized DSHS to

terminate the contract for "convenience." We conclude that DSHS had authority to terminate the contract regardless of the validity of the investigator's finding of neglect. And we affirm the summary dismissal of the suit.

## FACTS

¶2 Pamela Myers contracted with the DSHS Division of Developmental Disabilities to provide in-home care for her sister, a vulnerable adult, whom we will refer to throughout these proceedings as LL. DSHS paid Ms. Myers for 112 hours of care per month, beginning in 2002. Ms. Myers provided, and appears to continue to provide, additional hours of informal, unpaid care.

¶3 LL twisted her ankle and fell as she got up from a chair in Ms. Myers's basement. Ms. Myers's son and his friend were in the basement with LL at the time. The son asked LL whether she was injured. LL responded that she was fine. Ms. Myers also asked LL whether she needed to see a doctor. LL responded that she did not need to see a doctor and did not complain further. Ms. Myers examined LL's foot and saw that the foot was red. She applied ice and helped LL elevate the foot. Ms. Myers observed that LL was able to walk around the house normally except for a slight limp.

¶4 The same week that LL injured her ankle, she attended church with a friend. Her friend did not notice LL limping more than normal after her fall. LL attended classes and volunteered with Center Point, an organization that provided services to disabled adults. Two Center Point staff members saw that LL's foot appeared to be swollen and bruised. They also reported that LL told each of them that her foot was painful, and they noticed she limped more than normal.

¶5 LL rides the Spokane paratransit van. She told a fellow passenger that she had injured her foot at Ms. Myers's home and that Ms. Myers had dismissed the injury and threatened to scold her if she complained about it. The

passenger did not see LL's foot. LL also complained that she was forced to move to a new residence with Ms. Myers. The fellow passenger reported all of this to DSHS.

¶6 DSHS investigated. Sheila Mountjoy is an investigator for the Adult Protective Services branch of DSHS. She talked to Rhonda Kelsch, LL's case resource manager. Ms. Kelsch said that LL tends to exaggerate when she does not get her way and that she has issues with power and control. The next day, Ms. Mountjoy interviewed LL at Center Point. LL told Ms. Mountjoy that Ms. Myers disregarded her complaints about her foot and yelled at her. Ms. Mountjoy looked at LL's foot and noticed some bruising. LL felt pain when Ms. Mountjoy touched the bruise on the lower part of LL's foot. Ms. Mountjoy also interviewed Center Point staff member Heidi Bell. She confirmed what LL had told Ms. Mountjoy and added that she (Ms. Bell) was concerned about the relationship between LL and Ms. Myers. Ms. Mountjoy telephoned Ms. Myers and discussed the matter. Ms. Myers denied yelling at LL and explained that she did not believe LL's injury was serious enough to warrant a doctor's visit. Ms. Myers agreed, however, to bring LL to a doctor that day.

¶7 A doctor at an urgent care center treated LL's foot and placed her foot in a walking brace, or "boot." LL also saw an orthopedic specialist a couple of days later. The specialist noted that LL's foot was swollen but, after examining the foot and x-rays of the foot, he concluded that the injury was not serious, required no aggressive treatment, and would heal on its own.

¶8 Ms. Mountjoy talked to LL's mother, Joyce Haye, and Ms. Haye's husband, Robert Haye. They reiterated what Ms. Kelsch had told Ms. Mountjoy—that LL acts out when she does not get her way. They further explained that LL was unhappy about moving from one residence to another with Ms. Myers, and they reported that Ms. Myers cares well for LL and never yells at her.

¶9 Ms. Mountjoy spoke with the orthopedic specialist about LL's injury and treatment. And Ms. Mountjoy inter-

viewed Ms. Myers over the telephone. Ms. Myers reported that LL continued to state that her foot was fine, that LL was able to walk up and down the stairs in Ms. Myers's home, and that Ms. Myers checked LL's foot daily. Ms. Myers also reported that she had taken LL to see two doctors, a general practitioner at the urgent care clinic, and the orthopedic specialist. Ms. Myers had learned that the injury to LL's foot was not serious and required little treatment.

¶10 Ms. Mountjoy concluded her investigation and reported her findings to the Division of Developmental Disabilities. DSHS notified Ms. Myers the same day that Adult Protective Services found she had neglected a vulnerable adult, and DSHS terminated its contract with Ms. Myers based on the finding of neglect.

¶11 Ms. Myers appealed. An administrative law judge reversed the finding of neglect. And the DSHS Board of Appeals twice rejected DSHS's attempt to reinstate the finding of neglect.

¶12 Ms. Myers sued DSHS for breach of contract and tortious interference with a business relationship. The trial court dismissed both claims on summary judgment. Ms. Myers appeals only the dismissal of her breach of contract claim.

## ANALYSIS

¶13 We review a trial court's summary judgment de novo and so view the evidence in the light most favorable to the nonmoving party. *Seven Gables Corp. v. MGM / UA Entm't Co.*, 106 Wn.2d 1, 3, 721 P.2d 1 (1986). And we interpret contract provisions that do not require reference to extrinsic evidence de novo; they present questions of law. *State v. R.J. Reynolds Tobacco Co.*, 151 Wn. App. 775, 783, 211 P.3d 448 (2009).

¶14 Ms. Myers had to show (1) a contract that imposed a duty, (2) breach of that duty, and (3) an economic

loss as a result of the breach. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995). We interpret a contract according to the intent of the contracting parties, and to do so we focus "on the objective manifestations of agreement." *R.J. Reynolds Tobacco*, 151 Wn. App. at 783. We give the language of the contract its ordinary, usual, and popular meaning. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005). At issue here is whether DSHS breached a duty to Ms. Myers, a duty required by the contract.

¶15 Section 27(c) of this contract allows DSHS to terminate for default upon a finding of neglect "which [is] substantiated by the Adult Protecti[ve] Services." Clerk's Papers (CP) at 89. DSHS may also end the contract for convenience: "If it is later determined that the Contractor was not in default, the termination shall be considered a termination for convenience." CP at 89.

¶16 Ms. Myers argues that material issues of fact remain on whether DSHS failed to act in good faith or failed to "substantiate" its finding of neglect before terminating the contract. Ms. Myers also argues that DSHS failed to exercise the discretion afforded to it by the contract in good faith because it terminated the contract before she completed the appeals process. *See Frank Coluccio Constr. Co. v. King County*, 136 Wn. App. 751, 766, 150 P.3d 1147 (2007).

¶17 We will read an implied covenant of good faith and fair dealing into a contract "when the contract gives one party discretionary authority to determine a contract term." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997). But covenants of good faith and fair dealing do not trump express terms or unambiguous rights in a contract. *Id.* at 739-40. An Adult Protective Services investigator concluded that Ms. Myers had neglected LL. Under section 27(c), this is sufficient cause for DSHS to terminate the contract.

¶18 The contract here does not explain what standard Adult Protective Services must meet to determine that a

finding of neglect is "substantiated." Other states have, however, defined "substantiated" as "more likely than not" and "by a preponderance of the evidence." N.J. ADMIN. CODE § 10:129-1.3 (New Jersey child abuse statute determining that abuse or neglect is "substantiated" when "the available information, as evaluated by the child protective investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in [another statute]"); *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1177 (9th Cir. 2008) (determining that, under California's Child Abuse and Neglect Reporting Act, "substantiated" means "more likely than not that child abuse or neglect occurred").

¶19 But even if we were to apply the preponderance of the evidence standard here and conclude that an issue of fact remained, the termination for convenience provision at the end of section 27 would control. The plain language of that provision authorizes termination even when a finding of neglect is later determined to be unfounded: "If it is later determined that the Contractor was not in default, the termination shall be considered a termination for convenience." CP at 89; *R.J. Reynolds Tobacco*, 151 Wn. App. at 783.

¶20 The contract grants DSHS broad authority to terminate the contract, regardless of the outcome of the administrative process. The Washington Administrative Code supports inclusion of DSHS authority to terminate for default or for convenience in these contracts, as long as those contract terms do not conflict with the other home care rules. WAC 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 (providing that DSHS may terminate a care provider's contract for default or convenience as long as the contract's terms allow it and the terms are consistent with the relevant regulations).

¶21 Ms. Myers makes a persuasive case that she, essentially, did nothing wrong here. Indeed, the administrative hearing process vindicated her. She, however, ignores the termination for convenience provision of her contract and offers no statute or administrative rule with which it might

conflict. She raises questions of fact. But they are not material questions of fact. *Hearst Commc'ns*, 154 Wn.2d at 501; CR 56(c). DSHS had authority under this contract to terminate the contract on a finding of neglect by Adult Protective Services and, failing that, it could do so for convenience. The trial court properly dismissed her suit on summary judgment. And we, therefore, affirm.

SCHULTHEIS, C.J., and KORSMO, J., concur.

Review denied at 168 Wn.2d 1027 (2010).