[No. 40563-6-II.    Division Two.    February 28, 2012.]

THE DEPARTMENT OF ECOLOGY, *Respondent*, v. TIGER OIL
CORPORATION, *Appellant*.

*Joseph T. Reuter* (of *K&L Gates LLP*), for appellant.

*Robert M. McKenna, Attorney General,* and *John A. Level, Assistant,* for respondent.

*Cynthia I. Martinez* on behalf of City of Yakima, amicus curiae.

*Brian C. Gruber* on behalf of Washington Environmental Council, amicus curiae.

¶1 HUNT, J. — Tiger Oil Corporation (New Tiger)[1] challenges several superior court orders arising from (1) Model Toxics Control Act (MTCA)[2] litigation and a consent decree entered after Washington's Department of Ecology sued New Tiger for gasoline spills in Yakima during the late 1970s and early 1980s, and (2) New Tiger's incomplete remediation efforts under the consent decree. At the outset we note that New Tiger entered into a settlement agreement and consent decree that resolved all claims and defenses between it and Ecology; therefore, we do not address New Tiger's challenge to the 2004 summary judg-

---

[1] In this opinion, we refer to Tiger Oil *Corporation* as "New Tiger" and Tiger Oil *Company*, which dissolved in September 1988, as "Old Tiger."

[2] Ch. 70.105D RCW.

ment orders dismissing New Tiger's affirmative defenses to Ecology's MTCA lawsuit.[3] Similarly, because New Tiger did not timely appeal it below, we do not address the June 9, 2009 order denying New Tiger's request for superior court review of Ecology's final management review decision. We do, however, address New Tiger's timely appeal of the superior court's April 2, 2010 order affirming Ecology's final management review decision and the April 16, 2010 amended contempt order.

¶2 We affirm the superior court's April 2, 2010 orders striking the exhibit from New Tiger's counsel's declaration and affirming Ecology's final management review decision. We affirm most of the superior court's April 16, 2010 amended contempt order, except the part finding New Tiger in contempt for failure to operate the Interim Soil Vapor Extraction (SVE) System, which we reverse.

## FACTS

### I. TIGER PARCEL GASOLINE CONTAMINATION

#### A. Old Tiger; Gasoline Spills; 1982 Ecology Enforcement Order; Partial Remediation

¶3 In the late 1970s, Tiger Oil Company (Old Tiger) purchased a Yakima tract (Tiger Parcel) to operate a gasoline service station and convenience store. Located on this parcel were four underground storage tanks, each capable of holding several thousand gallons of gasoline. Old Tiger had installed new pipes and fittings on these underground tanks. In 1981, high levels of gasoline vapors in and around a nearby storm drain line caused an explosion that injured City of Yakima workers.

¶4 In September 1982, Old Tiger excavated soil from Tiger Parcel's southeast corner and discovered gasoline

---

[3] We further note that, later in 2004, New Tiger and Ecology entered into a consent decree settling the MTCA lawsuit in which these 2004 summary judgment orders had issued.

contamination. Testing revealed a leak in the new piping that Old Tiger had installed a few years earlier. In response, Ecology ordered Old Tiger "to recover floating [gasoline] product in groundwater at the Site[4] and to perform other investigative and remedial activities." Clerk's Papers (CP) at 19. Old Tiger contracted with an environmental remediation company, which installed recovery wells and began recovery operations. A few months later, Old Tiger discovered a second gasoline leak of an estimated 2,028 gallons in "the riser leading to one of the [gasoline] pumps" on the Tiger Parcel. CP at 373. Old Tiger repaired this leak.

¶5 In early 1983, Old Tiger's liability insurer, Federated Service Insurance Company,[5] assumed control of the remediation activities. An independent claims adjuster estimated that the combined first and second Tiger Parcel spills had released 20,000 gallons of gasoline. In January 1984, a vehicle collided with a gasoline dispenser on the Tiger Parcel, spilling an additional 50 gallons of gasoline. By March 1984, remediation activities had recovered approximately 16,000 gallons of the spilled gasoline. In September 1985, an environmental remediation company advised Federated Service that there remained "considerable contamination" in and around the Tiger Parcel and that "remediation [activities] should continue." CP at 374, 1613. In June 1986 and December 1987, the environmental remediation company detected "free product"[6] at "the Site." CP at 4539.

¶6 In 1987, Old Tiger began exploring the possibility of selling its assets, including the Tiger Parcel and the gas station and service store located on it. Seattle First Na-

---

[4] As we explain below, "the Site" refers to an area that is larger than and includes the Tiger Parcel.

[5] The record also refers to Federated Service as "Federated Mutual Insurance Company." CP at 278.

[6] "Free product" is gasoline that is "continually released into groundwater and soil" and absorbs into soil particles, dissolves into groundwater, and manifests "in the vapor phase in pore spaces" between soil particles. CP at 217.

tional Bank (Seafirst), Old Tiger's financial adviser, sent to Charles David Conley, President of Goodman Oil Company, a letter about a potential sale and a confidential memorandum describing the history and nature of Old Tiger's business, its assets, and its financial information. This memorandum also stated that leaking gasoline and contamination "w[ere] discovered" in the past but that Old Tiger did not "expect any further legal action" and that "[a]ll suits [had] been settled satisfactorily."[7] CP at 941.

¶7 When Conley told Seafirst "that [Old Tiger] had had a problem with underground storage tanks,"[8] Seafirst assured Conley that "all problems [relating to the three gasoline spills] had been taken care of." CP at 881. Conley understood these assurances to mean that "[law]suits, anything involved in [the gasoline spills] had all been taken care of." CP at 883. Conley also asked Goodman's general counsel to "make sure . . . that everything was handled"; but Goodman's counsel neither hired an independent environmental company to evaluate Tiger Parcel nor otherwise investigated the Site's environmental condition. CP at 887. Neither Conley nor anyone else at Goodman was aware of Ecology's 1982 enforcement order.

### B. New Tiger; Contamination; 1990 Ecology Enforcement Order

¶8 New Tiger was incorporated on August 13, 1987, and Conley soon became New Tiger's president and sole shareholder. CP at 1296. On October 1, New Tiger purchased Old Tiger's assets, including the Tiger Parcel, for $1,100,000. In the purchase and sale agreement, Old Tiger warranted "that there [was] no suit, action, legal, administrative or other proceeding pending or threatened against or affecting" Old Tiger. CP at 2428. The agreement also contained

---

[7] This memorandum did not mention Ecology's ongoing 1982 enforcement order against Old Tiger. *See* CP at 941.

[8] CP at 858.

indemnity clauses, in which Old Tiger and its owners guaranteed to "defend and hold [New Tiger] harmless of any and all claims . . . based solely on any alleged occurrence, contract, undertaking, or conduct occurring prior to the time of closing." CP at 2432.

¶9 In May and June 1988, Mercy Development Company LLC[9] acquired parcels surrounding Tiger Parcel and developed a Safeway shopping center and parking lot on the southern parcels. In September 1988, Old Tiger dissolved. Also that fall, the company that had installed the later-leaking pipes on the Tiger Parcel underground storage tanks for Old Tiger, after Old Tiger bought the parcel in 1978, asked a well driller to close any remaining monitoring and recovery wells at and around the Tiger Parcel because "no [remediation] activity had occurred . . . for a long time." CP at 95. While closing the wells in February 1989, the well driller discovered free gasoline product floating in one of the wells, refused to close the wells, and notified Ecology of this discovery.

¶10 In late March 1989, Ecology held a meeting with various parties, but not New Tiger, which Ecology did not notify about "the discovery of free product or of the meeting." CP at 375. In June, Ecology identified New Tiger as a "potentially liable person" under the MTCA, which had become effective just three months earlier. CP at 1088. The following year, on March 29, 1990, Ecology ordered New Tiger (1) to submit to Ecology a work plan, a compliance schedule, and a final "Remedial Investigation/Feasibility Study" detailing the new remediation efforts that New Tiger would undertake; and (2) to reimburse Ecology for its earlier Site remediation expenses. CP at 20. Ecology later amended this enforcement order to include Old Tiger, Federated Service, and Mercy as potentially liable persons.

¶11 In August 1990, New Tiger sued Old Tiger, Old Tiger's individual former owners, Federated Insurance,

---

[9] Mercy was formerly known as M&E Company.

Seafirst, and other parties "to determine . . . the parties' obligations with respect to the alleged contamination at the [Site], including the parties' obligations to investigate and remediate the alleged contamination." CP at 742-43. New Tiger alleged that Old Tiger had committed, among other things, fraud, negligent misrepresentation, and breach of contract. Around this time, New Tiger also employed an environmental remediation company to submit proposals to Ecology for remediation activities.

## C. 1994 Ecology Enforcement Order; Remediation

¶12 On September 27, 1994, Ecology ordered New Tiger, Old Tiger, Federated Service, and Mercy "to perform an Interim Action to recover free phase gasoline product and prevent infiltration of gasoline products." CP at 21. Between 1995 and 1996, an environmental remediation company that Federated Service hired installed a soil vapor extraction system (Interim SVE System)[10] on Mercy's northeast parcels. Federated Service operated the Interim SVE System until the spring of 1997. The remediation company estimated that between August 1995 and April 1997, the Interim SVE System removed approximately 1,750 pounds of gasoline contaminant.

¶13 In early April 1997, New Tiger settled its lawsuit with Old Tiger, Federated Service, and the other parties. Federated Service agreed to pay New Tiger $1,100,000 and another $1,625,000 in a trust account, to which New Tiger would be entitled after Ecology provided New Tiger with a "No Further Action determination."[11] CP at 1654. In return,

---

[10] A soil vapor extraction system removes gasoline vapors from the soil by "applying a vacuum through wells or horizontal perforated pipes near or at the source of contamination in the soil." CP at 3634-35. The soil vapor extraction system (1) draws the vapors outward; (2) treats the vapor with, for example, an "activated carbon absorption process" that removes contaminants; and (3) releases the treated vapors into the atmosphere. CP at 3635.

[11] A "No Further Action" determination is an official notification from Ecology that remediation activities are no longer required at the Site. CP at 3512.

New Tiger would release Old Tiger, Federated Service, and Old Tiger's former individual owners from all claims related to New Tiger's purchase of Old Tiger's assets. New Tiger also agreed to indemnify Old Tiger, Old Tiger's former individual owners, and Federated Service for "all settlements or detriments arising from any and all claims (including but not limited to claims by [Ecology]) . . . arising out of . . . the alleged soil and groundwater contamination at or emanating from the Sites." CP at 1660.

¶14 Following the settlement, New Tiger "took over the remediation," including the Interim SVE System's operation. CP at 4665. Throughout 1998, New Tiger continued to submit remediation studies and cleanup proposals to Ecology. One of the proposals, which Ecology accepted, defined "the Site" as

currently bounded by South 24th Avenue on the west, by West Nob Hill Boulevard on the north, by the Yakima County [storm drain line] and surrounding soil and backfill on the east, by the extent of gasoline-contaminated water in the [storm drain line] to the southeast, and by the parking lot in front of the Rite-Aid drugstore and Safeway store to the south.

CP at 32. In May 2001, New Tiger ceased operating the gas station at the Tiger Parcel.

### D. March 13, 2002 Ecology Enforcement Order; Cleanup Action Plan

¶15 On March 13, 2002, Ecology issued a cleanup action plan and enforcement order, which required New Tiger, Old Tiger, Federated Service, and Mercy (1) to remove the underground storage tanks at the Tiger Parcel, (2) to remove and to dispose of gasoline-contaminated soils at the Tiger Parcel, and (3) to install and to operate an SVE system.

¶16 In an April 2, 2002 letter, New Tiger, Old Tiger, and Federated Service advised Ecology that they had "sufficient cause for refusing to comply with [the March 13, 2002 enforcement order]" "and accompanying Final Cleanup Ac-

tion Plan." CP at 4533. They argued that the enforcement order and the cleanup action plan's requirements were "arbitrary and capricious actions by the Department of Ecology" for several reasons, including but not limited to, the following:

1. Cost of cleanup under [the cleanup action plan] is excessive in comparison to benefit to be obtained and value of properties involved: [The estimated] cost of cleanup under the [the cleanup action plan] would exceed $750,000. Given the extensive sums of money already expended on this [S]ite, the long-term history of the contamination, and the minimal risk presented by it, this cleanup far exceeds what is required by or reasonable under [MTCA].

2. The [cleanup action plan] includes provisions, which constitute a regulatory taking in violation of the federal and state constitutions.

3. The [cleanup action plan] violates the substantive due process rights of these [potentially liable persons].

4. The Department of Ecology allowed the contamination to remain for many years and, through its regulatory inaction, actually contributed to its migration, which has exacerbated cleanup costs.

5. The Enforcement Order and [the cleanup action plan] are not supported by and are inconsistent with the language and intent of MTCA.

CP at 4533.

## II. Ecology's MTCA Lawsuit and Consent Decrees

¶17 On June 6, 2002, Ecology filed a lawsuit asking the superior court to order New Tiger, Old Tiger, Federated Service, and Mercy[12] under the MTCA and the "Water

---

[12] Ecology alleged that New Tiger was "a current owner and operator" of part of the Site; Old Tiger "owned or operated a portion of the Site at the time of disposal or release of the hazardous substances"; Federated Service was a "former operator" of the Site; and Mercy was a "former owner and operator of a portion of the Site where hazardous substances [came] to be located." CP at 21-22.

Pollution Control Act"[13] to comply with Ecology's March 13, 2002 enforcement order and cleanup action plan to remediate contamination from gasoline spills and leaks at the Site.

## A. New Tiger's Answer

¶18 In its answer, New Tiger raised several affirmative defenses, including that the MTCA, "on its face and as applied to New Tiger with respect to the Site," violates "the due process and ex post facto clauses of the constitutions of the United States and the State of Washington" and "the takings clause of the Washington constitution." CP at 90. New Tiger also (1) raised common law defenses, including laches and estoppel; (2) contended that Ecology's own "claims against New Tiger [were] barred by [Ecology's] own gross negligence with respect to the Site"; (3) asserted that it was not liable under the MTCA's third-party contractual defense; and (4) claimed that Ecology's "actions and decisions with respect to the Site were arbitrary and capricious." CP at 90-91.

## B. Mercy Consent Decree

¶19 On August 15, 2003, the superior court entered a consent decree between Ecology and Mercy (Mercy consent decree). Ecology determined that any remediation contribution from Mercy would be "insignificant in amount and toxicity and that settlement with Mercy was both practicable and in the public interest." CP at 225.

¶20 The Mercy consent decree required Mercy to extend the Interim SVE System "in two directions." CP at 714. This work would form "the Mercy Property SVE System," which would be composed of the Interim SVE System, an "SVE Extension to the north," an "SVE Extension to the south-

---

[13] Ch. 90.48 RCW.

east[,] and any connecting piping."[14] CP at 714. Mercy was responsible for operating and maintaining the Mercy Property SVE System for a 30-month period, beginning when "[gasoline]-contaminated soil on the [Site] has been excavated and removed" and when "Ecology notifie[d] Mercy in writing that such work ha[d] been completed." CP at 715. Mercy's responsibility to operate and to maintain the Mercy Property SVE System was to terminate at the end of this 30-month period.

¶21 But if Mercy failed to excavate and to remove the contaminated soil at the Site within 30 months after installing the Mercy SVE Extensions, then Mercy's responsibility to operate and to maintain the system would terminate 30 months after installation of the Mercy SVE Extensions. The Mercy consent decree further provided that, once either the 30-month post-excavation period or the 30-month post-installation period lapsed, Ecology must decide whether "further operation of the Mercy Property SVE System [is] necessary"; if so, then "such operation may be conducted by Ecology . . . or by another person." CP at 717.

C. 2004 Summary Judgment Orders

¶22 Ecology moved for partial summary judgment to establish New Tiger's, Old Tiger's, and Federated Insurance's liability under the MTCA. Ecology also moved for partial summary judgment dismissal of New Tiger's affirmative defenses, which included the MTCA's third-party contractual defense, estoppel, laches, contributory negligence, and constitutional defenses (i.e., violations of New Tiger's state and federal substantive due process rights and New Tiger's rights under the Washington State Constitution's takings clause).

---

[14] This opinion refers to the northern and southeastern SVE extensions as the Mercy SVE *Extensions*, which should not be confused with the Mercy Property SVE *System*, a larger system encompassing both the Interim SVE System, the Mercy SVE Extensions, and "any connecting piping." CP at 714.

¶23 In a letter opinion dated April 20, 2004, the superior court granted, in large part, Ecology's partial summary judgment motions. CP at 2956-57. The superior court dismissed New Tiger's third-party contractual defense, finding that New Tiger had a "contractual relationship" with Old Tiger. CP at 2956. The superior court also dismissed New Tiger's affirmative defenses of laches, estoppel, negligence, and comparative fault, ruling that "these defenses are not provided for in MTCA and [are] inconsistent with [the] MTCA." CP at 2956. New Tiger did not challenge the rulings in the superior court's April 20 letter opinion. On May 14, the superior court issued a partial summary judgment order, which embodied its April 20 letter opinion dismissing the affirmative defenses listed above and, in addition, concluded that New Tiger and Old Tiger were liable under the MTCA. New Tiger did not challenge this May 14 order. In a different letter opinion dated May 18, the superior court dismissed New Tiger's constitutional affirmative defenses and wrote, "This Court finds that as of this date, New Tiger is unwilling to complete the cleanup of the [Site]." CP at 3132. New Tiger did not dispute this May 18 letter opinion.

¶24 Subsequently, Federated Service and Ecology signed a letter stipulating to dismissal of Federated Service, which the superior court dismissed from Ecology's MTCA lawsuit without prejudice. On May 24, the superior court issued a summary judgment order, which embodied its May 18 letter opinion rejecting New Tiger's constitutional affirmative defenses. New Tiger did not challenge this May 24 summary judgment order.

### D. New Tiger Consent Decree; Cleanup Action Plan

¶25  On October 29, 2004, Ecology and New Tiger entered into a consent decree,[15] which contained a cleanup action plan, dated June 8, 2004, specifying the "remedial action"[16] that New Tiger must undertake: removal of all underground storage tanks, removal of gasoline-contaminated soils, possible installation of a SVE system, "[c]ontinuing to operate and maintain the current interim remediation system," and potential "Monitored Natural Attenuation."[17] CP at 3500. The cleanup action plan's subsection titled "Cleanup Action Ownership" provided:

> New Tiger is responsible for the overall implementation and maintenance of the cleanup action. New Tiger is performing the actions in this [cleanup action plan] pursuant to [the] Consent Decree.
>
> In addition, Mercy . . . has entered into a separate Consent Decree [the Mercy consent decree] or additional remedial actions at the Site. The actions in this [cleanup action plan] and associated Decree will be coordinated with the activities called for in the [Mercy consent decree].

CP at 3501. The cleanup action plan also provided, "Because the [cleanup action plan] is agreed upon by Ecology and [New] Tiger, no disproportionate cost analysis is required." CP at 3514.

¶26 The cleanup action plan also specified "[c]leanup [s]tandards,"[18] which included "cleanup levels" and "points of compliance," and outlined several "cleanup actions." CP

---

[15] The consent decree also listed Federated Service as a party to the decree. But Federated Service was not responsible for "performing any of the work" in the decree. CP at 3501.

[16] CP at 3464.

[17] "[Monitored Natural Attenuation] relies on natural processes to break down contamination in soil or groundwater over time ('natural biodegradation')." CP at 5155.

[18] CP at 3510.

at 3506, 3512. Two cleanup actions are relevant here: the New Tiger SVE Extensions and monitored natural attenuation. The cleanup action plan explained that the

> interim remediation system[19] has been effective [but] is limited in its scope [because] the system may be adequate for remediating the subsurface of portions of the Safeway parking lot [to the south of the Tiger Parcel], [but] it does not target the areas where free product is present on the [Tiger Parcel].

CP at 3504. These Interim SVE System's deficiencies caused the cleanup action plan to require that (1) New Tiger dig two trenches on the Tiger Parcel "to determine the existence and amount of [the] free [gasoline] product"20 such that, if the "trenching" revealed "free product and/or TPH-G [total petroleum hydrocarbons gasoline] contamination at 30 ppm [parts per million] or greater in [the] soil, Tiger shall install an SVE system[21] to remediate contamination in the vicinity of the trenches"; and (2)

> [the New Tiger SVE Extensions] shall be engineered in such a way as to be connected to and become part of the vapor extraction system currently being used in the [Interim SVE System].
>
> *The Mercy [consent decree] also calls for Mercy to install and operate an SVE system on Mercy's property, which is part of the Site. The Mercy SVE system is to also be connected to the current interim remediation system.*

CP at 3507-08 (emphasis added).

¶27 The cleanup action plan also provided for monitored natural attenuation when the following four conditions were satisfied:

> (1) Source control (including removal and/or treatment of hazardous substances) has been conducted to the maximum extent practicable;

---

[19] The "interim remediation system" referred to the Interim SVE System.

[20] *See supra* note 3.

[21] For clarity in this opinion, we refer to this "SVE system" as the "New Tiger SVE Extensions."

(2) Leaving contaminants on-site during the restoration time frame does not pose an unacceptable threat to human health and the environment;

(3) There is evidence that natural biodegradation or chemical degradation is occurring and will continue to occur at a reasonable rate at the site; and

(4) Appropriate monitoring requirements are conducted to ensure that the natural attenuation process is taking place and that human health and the environment are protected.

CP at 3508 (citing WAC 173-340-370(7)(a)-(d)).

¶28 Under the cleanup action plan, Ecology would consider the Site "clean" when the soil and groundwater Method A cleanup levels had "been met for eight consecutive quarters, or two years of monitoring at all conditional points of compliance," commencing on "completion of the active remedial measures," such as the underground storage tank and gasoline-contaminated soil removals and New Tiger SVE Extensions installation. CP at 3511-12. Ecology would also issue a "No Further Action" determination when New Tiger met the cleanup action plan requirements and when the groundwater Method A cleanup levels had been met for two years in the conditional points of compliance. CP at 3512. "A [No Further Action] determination is not the equivalent of a clean site determination." CP at 3512.

¶29 The New Tiger consent decree further provided:

[A]ny laws requiring or authorizing local government permits . . . for the remedial action under this Decree that are known to be applicable at the time of entry of the Decree have been included in [the cleanup action plan] and are binding and enforceable requirements of the Decree. . . . In the event either New Tiger or Ecology determines that additional permits or approvals addressed in RCW 70.105D.090(1)[22] would otherwise be required for the remedial action under this Decree, it shall promptly notify the other party of this determination.

---

[22] Permits addressed in RCW 70.105D.090(1) include "local government permits or approvals for the remedial action."

. . . .

Ecology shall make the final determination on the additional substantive requirements that must be met by New Tiger and on how New Tiger must meet those requirements. . . . Once established by Ecology, the additional requirements shall be enforceable requirements of this Decree.

CP at 3487-88.

### E. Dispute Resolution Process

¶30 The New Tiger consent decree also had a multistep dispute resolution process. First, if New Tiger objected to Ecology's decisions, Ecology's and New Tiger's "project coordinators [would] then confer in an effort to resolve the dispute." CP at 3474. Second, if the project coordinators could not resolve the dispute, New Tiger could request, and Ecology's "Toxics Cleanup Program Manager" would issue, a written "final management review" decision; this decision would be "Ecology's final decision on the disputed matter." CP at 3474-75. If New Tiger found Ecology's final management review decision "unacceptable," New Tiger could advance to the third step by either (1) "request[ing], in writing . . . formal mediation in an attempt to resolve the dispute"; or (2) if New Tiger chose not to request mediation, "submit[ting] the dispute to the Court for resolution," in which case "the Court [would] review the action or decision of Ecology on the basis of whether such action . . . was arbitrary and capricious and render a decision based on such standard of review."[23] CP at 3475.

### III. Post-Consent-Decree Cleanup and Additional Litigation; Contempt

¶31 Between December 13 and 16, 2004, New Tiger removed four underground gasoline storage tanks from the

---

[23] The New Tiger consent decree further provided, "Implementation of these dispute resolution procedures shall not provide a basis for delay of any activities required in this Decree, unless Ecology agrees in writing to a schedule extension or the Court so orders." CP at 3476.

Tiger Parcel. Between December 20 and 22, New Tiger dug two trenches and installed SVE piping on the Tiger Parcel. In a January 19, 2005 letter, Ecology acknowledged that New Tiger had taken several positive steps at the Site, including underground storage tank removal, SVE pipe installation, and removal of at least 650 cubic yards of soil.[24]

¶32  A year later, in January 2006, Ecology advised New Tiger that it was failing to meet several consent decree requirements, including completing installation and commencing operation of the New Tiger SVE Extensions.[25] In April, New Tiger asked Ecology (1) to permit "complete cessation" of the Interim SVE System and "implementation of natural attenuation" at the Site, and (2) to issue a "written determination by Ecology that no further action (NFA) is required at the Site." CP at 4202. Ecology rejected these requests. In May, New Tiger and Ecology held a mediation session, during which Ecology agreed that it was "reasonable" for New Tiger to offer Mercy access to the Interim SVE System for an $8,400 fee, plus "one-half of the operation, maintenance, repair and inspection expenses for the system." CP at 4226-27. Mercy "never responded" to this offer. CP at 4227.

¶33  In a September 28, 2006 letter to New Tiger's environmental remediation company, the Yakima Regional Clean Air Authority wrote that "installation and operation of the Soil Vapor Extraction (SVE) system shall employ Best Available Control Technology (BACT) [to] control air

---

[24] Although the Mercy consent decree required Mercy to extend the Interim SVE System by installing the Mercy SVE Extensions, there was apparently some dispute about whether New Tiger interfered with Mercy's installing these extensions on the Interim SVE System (the latter of which New Tiger was still operating at the time) without receiving compensation from Mercy. *See* CP at 3908. This potential factual dispute, however, does not appear to have been a basis for the superior court's finding New Tiger in contempt, which finding the superior court based, in part, on New Tiger's ceasing operation of the Interim SVE System without Ecology's permission.

[25] New Tiger never commenced operating what would have become the New Tiger SVE Extensions.

pollution emissions." CP at 4590. Ecology later advised New Tiger, "In accordance with . . . Section XXIII.(B) [of the New Tiger consent decree], Ecology hereby informs [New Tiger] that Best Available Control Technology . . . shall be used to control the emissions of toxic air pollutants from the remedial systems that have been installed at [the Site]." CP at 3912. In December 2006, New Tiger ceased operating the Interim SVE System.

## A. Dispute Resolution Process

¶34 During 2007 and 2008, New Tiger and Ecology attempted to resolve their disputes about New Tiger's consent decree obligations. CP at 3758, 3771. Ecology subsequently issued its "final position" on September 23, 2008.[26] CP at 3771. Ecology's "final position" concluded that (1) New Tiger had failed in its responsibility to operate "the soil vapor extraction system"; (2) the cleanup action plan required New Tiger to allow Mercy to connect the Mercy SVE Extensions to the Interim SVE System without charge; (3) New Tiger's consent decree and the cleanup action plan required New Tiger to use Best Available Control Technology in conjunction with the soil vapor extraction technology; and (4) Ecology would not issue a " 'No Further Action' determination" because the Site had not satisfied Method A soil cleanup levels and because New Tiger had not commenced operating the New Tiger SVE Extension. CP at 3772.

¶35 On October 23, New Tiger "request[ed] final management review of all outstanding disputes between [New Tiger], Ecology and Mercy" under the consent decree's dispute resolution process. CP at 4234. New Tiger asserted that it had

spent a total of $417,942 on accounting, legal, environmental, trust administration and utilities for the years 2005, 2006[,]

---

[26] Ecology's "final position" was not Ecology's final management review decision. *See* CP at 3771, 4234.

and 2007. Since 1990, New Tiger and the Trust have spent over $2.3 million on environmental activities at New Tiger's properties in Yakima, with the vast majority of that amount being spent at the [Site].

CP at 4238. New Tiger also estimated that it would cost between $50,000 to $100,000 to operate the New Tiger SVE Extension for a six-month period.

¶36 On November 21, Ecology issued its final management review decision, explaining that (1) the cleanup action plan did not permit New Tiger to leave contaminated soil at the Site; (2) because free gasoline product was still present, Ecology refused to permit monitored natural attenuation; (3) the Site contained gasoline in the soil and groundwater above the "allowed levels" and, therefore, "the Site cannot be considered to pose 'no threat to human health and the environment' ";[27] (4) the New Tiger consent decree and the cleanup action plan required Best Available Control Technology because Ecology had approved the Yakima Regional Clean Air Authority's demand for such technology; and (5) it was "sensitive to the costs of remedial actions," such as the New Tiger SVE Extensions, but the New Tiger cleanup action plan provided, "Because the [cleanup action plan was] agreed upon by Ecology and Tiger, no disproportionate cost analysis [was] required." CP at 3629.

¶37 On December 24, New Tiger asked Ecology "whether mediation would be beneficial in resolving the disputed issues." CP at 3738. On February 11, 2009, Ecology replied that it was "not interested . . . since mediation would merely provide a venue in which modification of New Tiger's requirements under the Consent Decree would be sought by [New Tiger]." CP at 3738. While the parties were engaging the dispute resolution process, New Tiger was not operating the New Tiger SVE Extensions or the Interim SVE System.

---

[27] CP at 3628 (quoting RCW 70.105D.020(10)(d)).

### B. First Contempt Motion; "Motion for Dispute Resolution"

¶38 On April 10, 2009, Ecology filed a motion for order to show cause why "[New Tiger] should not be cited for contempt" and why "the Consent Decree between Ecology, [New Tiger], and Federated [Service] and the Cleanup Action Plan, should not be specifically enforced according to their terms." CP at 3644-45. New Tiger objected, arguing that Ecology's motion to show cause was procedurally improper under the consent decree.[28] CP at 3965.

¶39 On April 30, New Tiger filed a "motion for dispute resolution," seeking superior court review of Ecology's final management review decision, based on the New Tiger consent decree dispute resolution process.[29] CP at 3962. New Tiger asked the superior court to order that (1) New Tiger "need not operate the New Tiger SVE Extension," (2) New Tiger "need not use [Best Available Control Technology] filters on the SVE system," and (3) New Tiger "need not allow the owner of neighboring property [i.e., Mercy] to connect to or use the [Interim SVE System] unless that neighbor pays a share of the upgrade and operational costs, including [Best Available Control Technology] if that is required." CP at 3963.

¶40 At a June 3 hearing, the superior court explained that it interpreted New Tiger's "motion for dispute resolu-

---

[28] The consent decree provided that if New Tiger found Ecology's final management review decision "unacceptable" (which New Tiger so found), New Tiger (1) "has the right to submit the dispute to the Court for resolution," or (2) "may request, in writing, and Ecology *shall* participate in, formal mediation in an attempt to resolve the dispute." CP at 3475 (emphasis added). Ecology, however, apparently refused to participate in mediation and instead filed a motion seeking a contempt order against New Tiger. New Tiger also argued that Ecology sought "to proceed directly to a hearing on the merits" without obtaining and serving New Tiger with an order to show cause. CP at 3965-66.

[29] "If Ecology's final [management review] decision is unacceptable to New Tiger, New Tiger has the right to submit the dispute to the Court for resolution." CP at 3475.

tion" as a request for mediation under the consent decree. Verbatim Report of Proceedings (June 3, 2009) at 58. On June 19, the superior court denied Ecology's contempt motion, denied in part and granted in part New Tiger's dispute resolution motion, and ordered New Tiger and Ecology into mediation on the following issues: (1) whether the consent decree required New Tiger to operate the New Tiger SVE Extension; and (2) if so, whether New Tiger "must use [Best Available Control Technology] on the SVE system" and whether New Tiger "must . . . allow the owner of the neighboring property[30] to connect to or use the SVE system without paying a share of the upgrade and operational costs, including costs of [Best Available Control Technology]." CP at 4687-88.

¶41 Apparently, New Tiger and Ecology held an unsuccessful mediation session on August 5. In rejecting New Tiger's settlement counteroffer, Ecology also responded in a September 9, 2009 letter, "[I]t is clear that the SVE system will not be able to effectively address contamination at the Site. . . . Similar to [the opinion of a geologist that New Tiger hired to evaluate the Site], it is Ecology's position that the SVE system cannot effectively remove free product from the Site." CP at 5194.

## C. "Summary Judgment" Motion; Contempt

¶42 On September 15, 2009, New Tiger again sought superior court review of Ecology's final management review decision, this time, in a motion for "summary judgment." CP at 5015. New Tiger asked the superior court (1) to excuse New Tiger from operating the New Tiger SVE Extension, to permit New Tiger to use monitored natural attenuation, and to order Ecology to issue a "No Further Action" determination; (2) to order that New Tiger "need not allow its neighbors to connect to or use the SVE system free of

---

[30] Although likely, it is not clear from the record whether this "owner of the neighboring property" language referred to Mercy.

charge" and "need not use [Best Available Control Technology] on the system" if the superior court required New Tiger to operate the New Tiger SVE Extension; and (3) to release New Tiger from its consent decree. CP at 5016.

¶43 On November 10, Ecology filed another show cause motion, seeking a contempt order against New Tiger and relief similar to its April 10 request. Ecology also moved to strike from New Tiger's counsel's declaration, as inadmissible evidence of settlement negotiation, its September 9, 2009 letter, which stated, "[I]t is Ecology's position that the SVE system cannot effectively remove free product from the Site." CP at 5194.

¶44 In a December 11 letter opinion, the superior court denied New Tiger's so-called "summary judgment motion," explaining, "[T]here are a number of disputed facts," including (1) whether the Site has "acceptably low enough levels of toxins to excuse [New Tiger] from further clean up" at the Site and to allow New Tiger to use monitored natural attenuation; and (2) whether New Tiger must use the New Tiger SVE Extension and, if so, whether the New Tiger SVE Extension must use Best Available Control Technology.[31] CP at 5417. The superior court concluded that (1) Ecology had not acted "in an arbitrary and capricious manner when it determined that" New Tiger had failed to comply with all the consent decree requirements, including use of Best Available Control Technology; and (2) "it is premature . . . to order Ecology to issue a No Further Action letter and allow [monitored natural attenuation] at the Site." CP at 5418.

¶45 The superior court also found New Tiger in contempt:

It is undisputed that [New Tiger] unilaterally ceased to comply with the SVE requirements in December of 2006. Ecology did not agree to that action and [New Tiger] did not come to court to request permission before ceasing to comply. In ceasing to

---

[31] The superior court "deferr[ed]" its decision about charging New Tiger's neighbors for using the Interim SVE System. CP at 5417.

operate the SVE system[, New Tiger] violated the specific terms of the decree which state that even when the parties are using the dispute resolution process, as they did here, all obligations under the decree continue unless specifically waived. *Because [New Tiger] ceased operating the SVE without Ecology's permission or court order, it is in contempt of the Consent Decree. [New Tiger] is also in contempt for failing to install and use the [Best Available Control Technology] system.*

. . . .

The court finds that [New Tiger] is in contempt of the Consent Decree. [New Tiger] is ordered to immediately take all necessary steps to bring the SVE system up to operational status. Prior to beginning operation, [New Tiger] must submit a revised operation and maintenance plan for the SVE system (which includes the [Best Available Control Technology] requirement) to Ecology for its review and approval. [New Tiger] is further ordered to conduct required samplings, conduct well inspections and necessary repairs and otherwise comply with all requirements of the Consent Decree unless and until modified in writing by the parties and approved by the court. The court will impose a civil penalty of $2,000.00 per day beginning January 1, 2010, for each day [New Tiger] remains in contempt. Alternatively, [New Tiger] may purge itself of its contempt by complying, immediately, with all terms of the consent decree entered in 2004.

CP at 5418-19 (emphasis added). The superior court denied New Tiger's motion for reconsideration and a stay of its contempt order.

¶46 On April 2, 2010, the superior court issued three orders relevant here: (1) granting Ecology's motion to strike its September 9, 2009 letter from New Tiger's counsel's declaration, CP at 6128-29; (2) denying New Tiger's so-called "summary judgment motion" and affirming Ecology's final management review decision, CP at 5872; and (3) finding New Tiger in contempt of court

for failing to comply with the Decree because [New Tiger]: (1) *ceased operating the SVE system*[32] . . . without Ecology's permission or court order; and (2) failed to install and use [B]est [A]vailable [C]ontrol [T]echnolog[y] . . . when operating the SVE system.

CP at 5917 (emphasis added).[33] The superior court denied New Tiger's motion for reconsideration of the 2010 contempt order.

## IV. APPEAL

¶47 New Tiger filed a notice of appeal from (1) the superior court's 2004 summary judgment orders dismissing New Tiger's affirmative defenses to Ecology's MTCA lawsuit; (2) the superior court's June 9, 2009 order for superior court review of Ecology's final management review decision; (3) the superior court's April 2, 2010 order striking a letter exhibit from New Tiger's counsel's declaration; (4) the superior court's April 2, 2010 orders denying New Tiger's so-called "summary judgment motion"[34] and affirming Ecology's final management review decision; and (5) the

---

[32] The superior court defined the "SVE system" as including the New Tiger SVE Extensions, the Interim SVE System, and "other related equipment." CP at 5917.

[33] The superior court also ordered New Tiger (1) to "take all necessary steps to bring the [New Tiger SVE Extensions, the Interim SVE System, and other related equipment] up to operational status . . . until the cleanup standards set for in the [New Tiger Consent] Decree . . . are met, or cessation of operation is agreed to by Ecology and the Office of the Attorney General, or so ordered by the Court"; and (2) to "install and use BACT when operating the SVE system unless and until use of BACT is waived or cessation of use is permitted by the Yakima Regional Clean Air Agency . . . , or the court orders cessation." CP at 5918. The order further provided that New Tiger "may purge itself of its contempt . . . by complying immediately with the terms of the October 29, 2004 Decree." CP at 5919.

[34] In this April 2, 2010 order, the superior court denied New Tiger's so-called "summary judgment motion," which was actually a renewed request for superior court review of Ecology's final management review decision (New Tiger had unsuccessfully sought superior court review in 2009). Thus, in affirming Ecology's final management review decision, the superior court also effectively denied New Tiger's "summary judgment motion."

superior court's April 16, 2010 amended contempt order.[35] CP at 5899-5900. On April 16, 2010, the superior court granted New Tiger's motion to stay: "No further action may be taken in this case pending the outcome of [New Tiger's] Appeal to the Washington State Court of Appeals, Division II." CP at 5957.

¶48 Our court clerk notified New Tiger, "The decisions appealed from in the above referenced matter include several orders. It is questionable whether the orders are appealable as a matter of right as provided in RAP 2.2(a)."[36] New Tiger responded that although summary judgment denials normally are not appealable, the superior court's April 2, 2010 summary judgment denial was an exception because there was "no trial forthcoming" and "[i]n that sense, the [April 2, 2010 summary judgment denial order was] more like a verdict than the denial of a CR 56 motion for summary judgment." Appealability Br. of Appellant at 9. New Tiger also argued that the 2004 superior court orders were appealable because (1) "the decisions were not yet ripe for appeal when entered"; (2) "many of the decisions in those orders involved application of competing facts that have changed dramatically in the six years since the orders were entered"; and (3) "Ecology has repeatedly violated the Consent Decree, which prevents it from arguing now that the Decree subsumed all issues decided before entry into [the] Decree." Appealability Br. of Appellant at 10, 11, 13.

¶49 A commissioner of our court concluded, "[T]he [March 30, 2010[37]] and [April 16, 2010[38]] orders are appealable

---

[35] The superior court's amendments in the April 16, 2010 amended contempt order are not relevant.

[36] Letter from David Ponzoha, Clerk, Court of Appeals, Division Two, to Joseph T. Reuter, Attorney, K&L Gates (Apr. 19, 2010), *Dep't of Ecology v. Tiger Oil Corp.*, No. 40563-6-II (Wash. Ct. App.).

[37] It appears that the commissioner was referring to a series of superior court rulings dated March 30, 2010, which were filed on April 2, 2010. *See* CP at 5868-79, 6128-29.

[38] The April 16, 2010 order was the superior court's amended order of contempt. *See* CP at 5948.

as a matter of right under RAP 2.2(b)(1) and (3).[39] Those orders bring up for review the non-appealable orders preceding them.[40] RAP 2.4(a) and (b)." *See* Ruling on Mots., *Dep't of Ecology v. Tiger Oil Corp.*, No. 40563-6-II (Wash. Ct. App. May 6, 2010).

## ANALYSIS

### I. SUPERIOR COURT ORDERS NOT APPEALABLE OR NOT TIMELY APPEALED

### A. 2004 Summary Judgment Dismissals of Affirmative Defenses

¶50 We first address whether New Tiger's attempted appeal of the superior court's 2004 summary judgment orders dismissing its common law, statutory, and constitutional affirmative defenses to Ecology's MTCA complaint is properly before us. Shortly after the superior court issued these 2004 orders, New Tiger and Ecology entered into a settlement agreement and consent decree that resolved all claims and defenses between them. *See* CP at 3463-3530. Accordingly, we do not address the merits of New Tiger's attempted challenge to these 2004 orders on appeal.[41] *See Wash. Asphalt Co. v. Harold Kaeser Co.*, 51 Wn.2d 89, 91, 316 P.2d 126 (1957) ("A judgment by consent or stipulation of the parties . . . excuses all prior errors and operates to end all controversy between the parties, within the scope of the judgment."); *see also United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S. Ct. 1752, 29 L. Ed. 2d 256 (1971).

---

[39] It appears that the commissioner meant to refer to RAP 2.2(a)(1) and (3) because RAP 2.2(b) concerns state and local government criminal appeals, which the instant case does not involve.

[40] The commissioner did not explain which orders were "non-appealable."

[41] Our ruling here is not inconsistent with our commissioner's earlier ruling that New Tiger could include the 2004 orders in its notice of appeal.

## B. June 9, 2009 Order Denying Motion for Dispute Resolution

¶51 New Tiger also attempts to appeal the superior court's June 9, 2009 order denying its April 30 motion, in which New Tiger had asked the superior court to review Ecology's final management review decision. Because New Tiger never appealed this order, it is not properly before us, and we do not consider the merits of New Tiger's argument.

## II. Timely Appealed Superior Court Order Striking Settlement Negotiation Letter

¶52 New Tiger next argues that the superior court erred in striking Ecology's September 9, 2009 letter, attached to New Tiger's counsel's declaration as Exhibit 56, rejecting New Tiger's settlement counterproposal. Because this letter was inadmissible under ER 408 as "[e]vidence of conduct or statements made in compromise negotiations," we hold that the superior court did not err by striking it.[42]

---

[42] Exhibit 56 was a letter dated September 9, 2009 from Ecology's trial counsel to New Tiger's trial counsel three months after the superior court had ordered the parties into mediation to resolve consent decree disputes. The mediation was unsuccessful.

New Tiger is correct in that the September 9, 2009 letter is not "evidence of . . . furnishing or offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount." ER 408. Nevertheless, the September 9, 2009 letter clearly is "[e]vidence of conduct or statements made in compromise negotiations," namely the court-ordered mediation and New Tiger's subsequent counterproposal, which Ecology rejected. ER 408; CP at 5194. As Ecology correctly notes, " 'Rule 408 bars evidence of settlement negotiations regardless of whether those negotiations actually produce a settlement.' " Br. of Resp't at 25 (quoting 5A Karl B. Tegland, Washington Practice: Evidence Law and Practice § 408.4, at 63 (5th ed. 2007)).

New Tiger is also correct, however, that "[ER 408] also does not require exclusion when the evidence is offered for another purpose." ER 408; see Br. of Appellant at 22-23. But the "other purposes" for which New Tiger offers this evidence and the cases it cites in support do not apply here. The party that drafted the letter, Ecology, was not the party that introduced the letter during the proceedings below. Nor does New Tiger persuade us that the September 9, 2009 letter shows Ecology's "mental state" or that the letter was admissible for "impeachment purposes and

### III. Timely Appealed April 2, 2010 Order Denying "Summary Judgment"

¶53 Next, we address the ambiguous nature of New Tiger's September 15, 2009 so-called "summary judgment motion" and the superior court's April 2, 2010 denial of that motion. Despite New Tiger's labeling it a "summary judgment" motion, this motion was actually a motion for dispute resolution under the consent decree, seeking superior court review of Ecology's final management review decision.

¶54 Section XIV(B) of New Tiger's consent decree provided, "If Ecology's final written [management review] decision is unacceptable to New Tiger, New Tiger has the right to submit the dispute to the Court for resolution."[43] CP at 3475. The opening paragraph of New Tiger's so-called "summary judgment motion" stated, "This motion is based upon the dispute resolution provision of the Consent Decree." CP at 5015. Similarly, in its "reply brief" in support of "summary judgment," New Tiger wrote, "The instant [September 15, 2009] motion for summary judgment is expressly 'based upon the dispute resolution provision of the Consent Decree herein.'"[44] CP at 5180 (quoting CP at 5015). For this reason, New Tiger's September 15, 2009 motion was essentially an appeal to superior court from Ecology's final management review decision. Accordingly, we treat the superior court's April 2, 2010 order as a denial

rebutting evidence" from Ecology's "Environmental Specialist," Norman Peck. Accordingly, we find no trial court error in striking this letter under any standard of review.

[43] Ecology issued its final management review decision on November 21, 2008. On April 30, 2009, New Tiger filed a "motion for dispute resolution," which invoked the consent decree's dispute resolution process and challenged Ecology's final management review decision. CP at 3962. The superior court ordered the parties into mediation, which was unsuccessful.

[44] Consistent with these representations, New Tiger previously explained to our commissioner, "In an effort to avoid further confusion about the purpose of its renewed motion [for dispute resolution], New Tiger called the renewed [September 15, 2009] motion a 'Motion for Summary Judgment.'" Appealability Br. of Appellant at 4.

of New Tiger's September 15, 2009 request to reverse Ecology's final management decision; and we affirm the superior court's April 2, 2010 order affirming Ecology's final management review decision.

### A. Standard of Review—"Arbitrary and Capricious"

¶55 New Tiger's consent decree does not specify a standard of review to guide our review of a superior court decision under the consent decree's dispute resolution provision. But New Tiger's September 15, 2009 motion was an appeal to the superior court of an agency action, namely Ecology's final management review decision; thus, New Tiger's appeal of this superior court decision falls within the Administrative Procedure Act (APA), chapter 34.05 RCW.[45]

¶56 Under the APA, we " 'sit[ ] in the same position as the superior court,' "[46] reviewing Ecology's final management review decision just as the superior court did. New Tiger's consent decree required the superior court to review Ecology's decision under an "arbitrary and capricious" standard. CP at 3475. The MTCA also provides that a superior court must review Ecology's investigative and remedial decisions under the arbitrary and capricious standard. *See* RCW 70.105D.060.

¶57 New Tiger contends, however, "The arbitrary and capricious standard applies only to the trial court's review of Ecology actions and decisions. This Court still reviews the trial court's decisions de novo." Br. of Appellant at 12 (emphasis omitted). New Tiger is incorrect. We review the superior court's decision by engaging in the *same inquiry* as the trial court, which encompasses the same standard of

---

[45] "An aggrieved party may secure appellate review of any final judgment of the superior court under this chapter by the supreme court or the court of appeals." RCW 34.05.526.

[46] *Nix v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 902, 912, 256 P.3d 1259 (2011) (internal quotation marks omitted) (quoting *Utter v. Dep't of Soc. & Health Servs.*, 140 Wn. App. 293, 299, 165 P.3d 399 (2007)).

review, namely "arbitrary and capricious." *Nix v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 902, 913, 256 P.3d 1259 (2011).

¶58 The "one who seeks to demonstrate that action is arbitrary and capricious must carry a heavy burden." *Pierce County Sheriff v. Civil Serv. Comm'n for Sheriff's Emps.*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983). "Agencies act in an arbitrary or capricious manner when their action is 'willful and unreasoning and taken without regard to the attending facts or circumstances.' "[47] "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 589, 90 P.3d 659 (2004).

¶59 "[S]ubstantial judicial deference to agency views [is] appropriate when an agency determination is based on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997) (citing William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 832 (1989)). We also give "substantial weight to the agency's interpretation of the statutes it administers"[48] and accord "great deference" to Ecology's interpretation of its own regulation, "as the agency has expertise and insight gained from administering the regulation that the reviewing court does not possess." *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 56, 239 P.3d 1095 (2010). Applying these standards here, we find no arbitrary and capricious action by Ecology.

---

[47] *Cmty. Ass'n for Restoration of Env't v. Dep't of Ecology*, 149 Wn. App. 830, 841, 205 P.3d 950 (2009) (quoting *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997)).

[48] *Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus.*, 112 Wn. App. 291, 296, 49 P.3d 135 (2002), *review denied*, 149 Wn.2d 1003 (2003).

## B. Ecology's Final Management Review Decision

¶60 New Tiger argues that, in rendering its final management review decision, Ecology erred in three ways: (1) by refusing to allow New Tiger to conduct monitored natural attenuation at the Site; (2) by not excusing New Tiger from operating the New Tiger SVE Extensions; and (3) by requiring New Tiger to use Best Available Control Technology with all soil vapor extraction technology at the Site. These arguments fail.

### 1. Monitored natural attenuation

¶61 We first address Ecology's refusal to allow Tiger Oil to use the monitored natural attenuation method (as opposed to, for example, the soil vapor extraction method) to clean up the remaining gasoline contamination.[49] New Tiger contends that monitored natural attenuation was "all that [was] left to do." Br. of Appellant at 18. Ecology responds that monitored natural attenuation "is a permissible remedial action that may later be appropriate" but that the Site circumstances at that time did not satisfy all the prerequisites for monitored natural attenuation. Br. of Resp't at 28. Ecology's argument prevails.

¶62 The Tiger Oil consent decree cleanup action plan provided for monitored natural attenuation only when the Site satisfied the following four conditions:

(1) *Source control (including removal and/or treatment of hazardous substances) has been conducted to the maximum extent practicable*;

(2) Leaving contaminants on-site during the restoration time frame does not pose an unacceptable threat to human health and the environment;

---

[49] In its September 15, 2009 motion, New Tiger argued that the superior court should reverse Ecology's determination and permit New Tiger to use monitored natural attenuation at the Site. The superior court rejected this argument, implicitly affirming Ecology's determination.

*(3) There is evidence that natural biodegradation or chemical degradation is occurring and will continue to occur at a reasonable rate at the site;* and

(4) Appropriate monitoring requirements are conducted to ensure that the natural attenuation process is taking place and that human health and the environment are protected.

CP at 3508 (emphasis added) (citing WAC 173-340--370(7)(a)-(d)). New Tiger contends that the Site satisfied all four prerequisites for monitored natural attenuation. Ecology counters that the Site had not satisfied the first and third prerequisites.

¶63 With regard to the first natural attenuation prerequisite, Ecology asserts that the presence of gasoline free product in monitoring wells at the Site showed that source control had "not been conducted to the maximum extent practicable."[50] Br. of Resp't at 28-29. New Tiger replies that it satisfied the "practicable" requirement, despite the gasoline free product's presence. Reply Br. of Appellant at 4. The parties disagree about the meaning of "practicable." Under WAC 173-340-200, "practicable"

means capable of being designed, constructed and implemented in a reliable and effective manner including consideration of cost. When considering cost under this analysis, an alternative shall not be considered practicable if the incremental costs of the alternative are disproportionate to the incremental degree of benefits provided by the alternative over other lower cost alternatives.

¶64 New Tiger argues that the New Tiger SVE Extensions were not " 'practicable' " because they were not cost beneficial. Br. of Appellant at 18. This argument fails because New Tiger essentially waived any future argument about cost-benefit by agreeing in the cleanup action plan that "no disproportionate cost analysis [was] required" for the agreed components of the cleanup action plan, including

---

[50] In April 2009, for example, two monitoring wells still contained 2.71 feet and 1.06 feet of gasoline, respectively.

the New Tiger SVE Extensions. CP at 3514. But even if New Tiger could plausibly advance a cost-benefit definition of "practicable" on appeal, Ecology's interpretation of "practicable" prevails because we accord great deference to an agency's interpretation of its own regulation. *Overlake Hosp. Ass'n*, 170 Wn.2d at 56.

¶65 Furthermore, Tiger Oil does not establish that Ecology acted arbitrarily and capriciously in enforcing its definition of "practicable" where the record shows that Ecology acted in good faith and "there is room for two opinions"[51] about whether "[s]ource control (including removal and/or treatment of hazardous substances) [was] conducted to the maximum extent practicable." CP at 3508. Five months after Ecology issued its final management review decision refusing to allow New Tiger to conduct monitored natural attenuation to remediate the contamination, the Site still contained several feet of free gasoline product.

¶66 The question on appeal, however, is not identifying the *optimal* method for New Tiger to remediate free gasoline product. Rather, the question is whether there could be reasonable disagreement about the "practicable" ways to remove the free gasoline product from the Site. *See Port of Seattle*, 151 Wn.2d at 589; WAC 173-340-200. According deference to Ecology's decision, we hold that there could be such reasonable disagreement. Thus, even if New Tiger might have removed this free gasoline product through natural processes, such possibility does not establish that Ecology's contrary decision and choice of an alternative remediation method was arbitrary and capricious.

¶67 With regard to the third natural attenuation prerequisite, Ecology argues that it properly refused New Tiger's request to remediate using monitored natural attenuation because there was no " 'evidence that natural biodegradation or chemical degradation [was] occurring and [would] continue to occur at a reasonable rate at the

---

[51] *Port of Seattle*, 151 Wn.2d at 589.

[S]ite.'" Br. of Resp't at 27-30 (emphasis omitted) (quoting WAC 173-340-370(7)(c)). The record supports Ecology's assertion. Although there was some evidence that natural biodegradation had occurred at the Site in 1996,[52] this evidence was contested by more recently gathered evidence in 2006, closer in time to Ecology's November 21, 2008 final management review decision.[53] In light of this conflicting, though seemingly not comparably relevant, evidence, we acknowledge that "there is room for two opinions" about whether the Site satisfies monitored natural attenuation's natural-biodegradation prerequisite[54] and that Ecology and New Tiger may reasonably disagree. Nevertheless, we hold that Ecology did not act arbitrarily and capriciously in refusing to allow New Tiger to remediate the remaining free gasoline using monitored natural attenuation because (1)

---

[52] Chris Generous, one of New Tiger's environmental remediation company's employees, wrote in an April 27, 2006 letter to Ecology:

[C]ase studies conducted by the [United States] government and [various] State regulatory agencies . . . point out that dissolved oxygen measurements alone are sufficient at most sites to verify biological degradation is contributing to the overall natural attenuation of a plume. Past dissolved oxygen (D.O.) monitoring at the site has already shown an aerobic condition exists around the edge of the plume at the site (generally an oxygen level above 0.7 mg/l [milligrams per liter] is considered aerobic). D.O. levels at the Site have been measured at over five times this amount. New Tiger, upon request, can provide references to these studies and results of D.O. measurements taken at the Site and presented to Ecology over 10 years ago.

CP at 4969.

[53] A declaration from October 2, 2009, Norman D. Peck, an "Environmental Specialist 4 with the Toxics Cleanup Program (TCP) of Ecology's Central Regional Office," CP at 3632, challenged Generous's letter:

There has been no testing done in the information wells to verify that biodegradation is occurring, or, if it is, at what rate and in what location(s) it is occurring. It is common for biodegradation to occur at the fringes of a dissolved plume, but not near areas where free-phase [gasoline] is present. To aid in the analysis of possible biodegradation and determine the effectiveness of remedia[tion] actions that took place from 2004 to 2006, [New Tiger] should conduct sampling from [i]nformation [w]ells, and should have [conducted such sampling] before seeking to argue that [monitored natural attenuation] is appropriate.

CP at 5156.

[54] *Port of Seattle*, 151 Wn.2d at 589.

Ecology's evidence showing the absence of recent natural biodegradation was more timely and relevant than New Tiger's evidence showing supposed natural biodegradation in 1996; and (2) the record does not show bad faith on the part of Ecology.[55]

## 2. New Tiger SVE Extensions

¶68 We next address whether Ecology acted arbitrarily and capriciously in refusing to excuse New Tiger from operating the New Tiger SVE Extensions.[56] In New Tiger's October 23, 2008 letter seeking Ecology's final management review of the disagreements that it had with the consent decree, New Tiger wrote:

> Operat[ing] . . . the New Tiger SVE Extension[s] represents the last active remedial measure that could possibly be required by the [Cleanup Action Plan]. New Tiger is willing to operate the New Tiger SVE Extension on a limited basis (by conducting a pilot test and then operating for six months using BACT), on the condition that Mercy agrees in a court-approved stipulation to pay its fair share of the costs to operate the SVE Treatment Compound Equipment.

CP at 4237-38. In its final management review decision on November 21, 2008, Ecology rejected this offer, explaining:

> Only when the air samples show that the system is no longer treating soil contamination can the SVE system be shut down. . . . Once the soil Method A levels are met then conformational sampling of the groundwater can begin. . . . The

---

[55] For the first time on appeal, New Tiger asserts that Peck's "credibility" and "bias" are "at issue" and that "Peck's testimony against [monitored natural attenuation] lacks foundation." Br. of Appellant at 15, 17. New Tiger failed to preserve these arguments below; therefore, we do not consider them on appeal. RAP 2.5(a)(3).

[56] Although New Tiger also asked the superior court to review Ecology's refusal to permit New Tiger to operate the New Tiger SVE Extensions "on a limited basis," CP at 4237-38, New Tiger appears to have abandoned this argument on appeal and instead argues only that it should not have to operate the New Tiger SVE Extensions at all.

points of compliance[57] for the Site include all areas where contaminants have come to be located.

CP at 3628.

¶69 On appeal, New Tiger proposes several criteria as measures for when it should be allowed to cease operating the New Tiger SVE Extension. But these measures differ from those to which New Tiger and Ecology agreed in the 2004 consent decree and the cleanup action plan. For example, New Tiger now claims that the Site is "not a danger because there is no exposure pathway." Reply Br. of Appellant at 3. But the agreed cleanup action plan does not use the existence of an exposure pathway as a criterion for determining whether New Tiger has satisfied its remediation obligations under the cleanup action plan.[58]

¶70 The proper criteria for allowing New Tiger to cease operating the New Tiger SVE Extension are the cleanup standards to which New Tiger and Ecology agreed in the cleanup action plan. Because installation and operation of the New Tiger SVE Extension are "cleanup actions"[59] under the terms of the consent decree,[60] they must comply with the cleanup action plan's cleanup standards at the "points

---

[57] "Points of compliance" are the "points where cleanup levels . . . shall be attained." WAC 173-340-200. The Cleanup Action Plan specified "conditional points of compliance" for the Site's soil as "all areas where contaminants have come to be located" and, for groundwater, at various monitoring wells and the storm drain line. CP at 3512.

[58] *See also* Br. of Amicus Curiae Wash. Envtl. Council at 5 ("New Tiger's attempt to revise and reinterpret the agreed-upon cleanup standards in the consent decree is in direct conflict with Ecology's authority under the MTCA.").

[59] A "cleanup action" is a type of "remedial action"; a "remedial action," in turn, is "any action or expenditure consistent with the purposes of the [MTCA] to identify, eliminate, or minimize any threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities." WAC 173-340-200. A "cleanup action" is a "remedial action" that "compl[ies] with cleanup standards." WAC 173-340-355(2). Not all remedial actions are cleanup actions; the remedial actions that do not comply with cleanup standards are "interim action[s]." WAC 173-340-355(2).

[60] *See* CP at 3504-08.

of compliance."[61] CP at 3512. But New Tiger has not demonstrated, either below or on appeal, that the Site satisfies these agreed cleanup action plan standards. Moreover, the record shows that Ecology did not act arbitrarily and capriciously in determining that the Site did not satisfy cleanup action plan prerequisites for implementing monitored natural attenuation. In the absence of satisfied prerequisites, Ecology had no reason to terminate New Tiger's responsibility for operating the New Tiger SVE Extension.

¶71 Nevertheless, New Tiger asserts that "the Decree plainly does not require all contamination above Method A levels to be removed from the [S]ite." Reply Br. of Appellant at 5. New Tiger cites three parts of the cleanup action plan in support: (1) the cleanup action plan provides for the eventual use of monitored natural attenuation; (2) the cleanup action plan allows for " 'institutional controls' " at " 'all areas of the Site where cleanup levels[62] have not been attained for soil and groundwater' "; and (3) the cleanup action plan provides for leaving contaminated soil under a building at the Site. Reply Br. of Appellant at 5 (quoting CP at 3512). New Tiger's arguments require us to interpret the consent decree and the cleanup action plan language.

¶72 "A consent decree has a contractual nature; therefore, contract principles of construction apply." *State v. R.J. Reynolds Tobacco Co.*, 151 Wn. App. 775, 783, 211 P.3d 448, *review denied*, 168 Wn.2d 1026 (2009). "The touchstone of contract interpretation is the intention of the parties, which Washington courts attempt to determine by focusing on the objective manifestations of agreement." *R.J. Reynolds Tobacco*, 151 Wn. App. at 783 (footnote omitted).

---

[61] For soil, the points of compliance are "all areas where contaminants have come to be located"; for groundwater, the points of compliance are at various monitoring wells and the storm drain line. CP at 3512.

[62] A "cleanup level defines the concentration of hazardous substances above which a contaminated medium (e.g., soil) must be remediated in some manner (e.g., treatment, containment, institutional controls)." WAC 173-340-355(2). The cleanup action plan set forth "Method A cleanup levels," which appear in Ecology's regulations, for the Site's groundwater and soil. CP at 3510; *see* WAC 173-340-900.

Moreover, we must avoid a " 'strained or forced construction' " of the consent decree and cleanup action plan and avoid interpretations "leading to absurd results." *Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 341, 738 P.2d 251 (1987) (quoting *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 907, 726 P.2d 439 (1986)). Instead, we give the consent decree and cleanup action plan a " 'practical and reasonable' " reading. *Eurick*, 108 Wn.2d at 341 (quoting *E-Z Loader*, 106 Wn.2d at 907).

¶73 New Tiger is correct that the cleanup action plan allows *possible use* of monitored natural attenuation, which assumes the existence of residual contamination that would be present at the Site even after completion of other cleanup activities, such as soil vapor extraction. Indeed, the cleanup action plan states that the MTCA "allows for natural attenuation when [*l*]*eaving contaminants* on-site . . . does not pose an unacceptable threat." CP at 3508 (emphasis added). But New Tiger wrongly reasons that, because the cleanup action plan contemplates the *possibility* of leaving contaminants on-site, then New Tiger is free to abandon the cleanup action plan's cleanup standards altogether if New Tiger unilaterally chooses to so do. New Tiger ignores that the cleanup action plan permits New Tiger to replace more active cleanup activities with monitored natural attenuation *only* if the Site meets four conditions: maximized source control, absence of unacceptable health and environmental threats, evidence of ongoing natural biodegradation or chemical degradation, and effective monitoring. As we have already explained, the evidence supported Ecology's decision that the Site had not satisfied the first and third conditions of the cleanup action plan.

¶74 Next, New Tiger points out that the cleanup action plan allowed " 'institutional controls' "[63] at " 'all areas

---

[63] The term " '[i]nstitutional controls' means measures undertaken to limit or prohibit activities that may interfere with the integrity of an interim action or a cleanup action or result in exposure to hazardous substances at the site." WAC 173-340-200. Examples include "[p]hysical measures" such as fences and "[e]du-

of the Site where cleanup levels have not been attained for soil and groundwater.' " Reply Br. of Appellant at 5 (quoting CP at 3512). New Tiger focuses on the " 'areas of the Site where *cleanup levels have not been attained*' " and asserts that the cleanup action plan did not require New Tiger to satisfy the cleanup levels. Br. of Appellant at 5 (emphasis added) (quoting CP at 3512). But the "institutional controls" to which New Tiger refers were temporary measures designed "to limit or prohibit activities that may interfere with the integrity of an interim action or a cleanup action." WAC 173-340-200. The cleanup action plan further provided, "If it is determined that cleanup levels for soil and groundwater have been attained in a portion of the [S]ite that is delineated by property boundaries, institutional controls *may be removed* from that property." CP at 3512-13 (emphasis added). Thus, in expressly providing for temporary institutional controls, the cleanup action plan impliedly contemplated periodic temporary failures to achieve cleanup standards, not the abolition of those standards altogether.

¶75 Lastly, New Tiger contends that it did not need to meet the cleanup standards because the cleanup action plan "provides for leaving contaminated soil under [the New Tiger convenience store] as long as the building remains." Reply Br. of Appellant at 5. But New Tiger does not explain how the cleanup action plan's acknowledgement of the existence of contaminated soil under this specific building-covered part of the Site meant that New Tiger could ignore cleanup standards throughout the rest of the Site. New Tiger also appears to contend that it should be able to ignore the cleanup standards altogether because, for example, according to New Tiger, "The [S]ite has not presented a risk since at least 1994." Br. of Appellant at 16. New Tiger's opinion of the Site's "risk," however, does not control, and it ignores the cleanup action plan's clear

cational programs" such as public notices and health advisories. WAC 173-340--440(1)(a), (d).

commands. Ecology accurately responds that "[t]hese regulatory cleanup levels provide the only legally relevant measure of risk." Br. of Resp't at 23.

¶76 New Tiger also complains about the soil vapor extraction technology's alleged ineffectiveness and criticizes Ecology's experts' "qualifications and [S]ite knowledge"[64] in comparison to that of New Tiger's experts. These arguments are not persuasive. If New Tiger did not agree with the consent decree and cleanup action plan terms, such as whether soil vapor extraction technology was a viable cleanup measure, or if New Tiger believed Ecology had insufficient expertise to negotiate the agreements, New Tiger should not have signed off on the consent decree and the cleanup action plan. "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *Armour*, 402 U.S. at 681. We do not rewrite those "precise terms" simply because New Tiger now regrets having agreed to them.[65] Accordingly, we hold that Ecology did not act arbitrarily and capriciously in requiring New Tiger to continue operating the New Tiger SVE Extensions at the Site.

---

[64] Br. of Appellant at 16.

[65] For example, New Tiger cites an April 27, 2006 letter from Chris Generous, an employee from one of its environmental remediation companies, opining that installing the New Tiger SVE Extensions would "offer[ ] no added value," 18 months *after* New Tiger entered into the consent decree on October 29, 2004, agreeing to install the New Tiger SVE Extension if the trenching found contamination (which it did). CP at 4201. It is irrelevant that, as New Tiger now asserts, "[T]he cost [of the New Tiger SVE Extension] is outweighed by the likely usefulness of the work," Br. of Appellant at 13, because New Tiger agreed to the following contrary cleanup action plan term: "Because the [Cleanup Action Plan] is agreed upon by Ecology and [New] Tiger, no disproportionate cost analysis is required." CP at 3514; *see also* Br. of Amicus Curiae Wash. Envtl. Council at 9 ("New Tiger entered into the consent decree of its own accord, and agreed to meet the cleanup standards and perform the cleanup actions selected in the [Cleanup Action Plan]. New Tiger already negotiated and agreed to its responsibilities under the consent decree, and it should not be permitted to promote *ex post facto* arguments when it no longer wishes to comply.").

### 3. Best Available Control Technology

¶77 Lastly, New Tiger challenges Ecology's final management review decision's requiring New Tiger to use Best Available Control Technology with all soil vapor extraction technology at the Site. New Tiger baldly asserts that the consent decree and the cleanup action plan do not require Best Available Control Technology. New Tiger is incorrect.

¶78 In its letter seeking final management review by Ecology, New Tiger wrote, "Absent an agreement [requiring Mercy to pay a portion of costs], it is New Tiger's position that [Best Available Control Technology] is not required because, among other things, it imposes a cost that is disproportionate to any benefit that could be realized from its use." CP at 4238. Ecology responded, "[T]he use of [Best Available Control Technology] is required during any operation of the SVE system at the [Site]." CP at 3629. In its September 15, 2009 dispute resolution motion, New Tiger similarly argued, "If [New] Tiger is required to operate the New Tiger SVE Extension, it need not use [Best Available Control Technology] on the system." CP at 4825. The superior court rejected this argument, affirming Ecology's final management review decision that Best Available Control Technology was required.

¶79 The record supports Ecology's and the superior court's decisions. Section XXIII(B) of the consent decree reads:

> In the event either New Tiger or Ecology determines that additional permits or approvals addressed in RCW 70.105D-.090(1) would otherwise be required for the remedial action under this Decree, it shall promptly notify the other party of this determination. Ecology shall determine whether Ecology or New Tiger shall be responsible to contact the appropriate state and/or local agencies. If Ecology so requires, New Tiger shall promptly consult with the appropriate state and/or local

agencies and provide Ecology with written documentation from those agencies of the substantive requirements those agencies believe are applicable to the remedial action. *Ecology shall make the final determination on the additional substantive requirements that must be met by New Tiger and on how New Tiger must meet those requirements. Ecology shall inform New Tiger in writing of these requirements. Once established by Ecology, the additional requirements shall be enforceable requirements of this Decree.*

CP at 3487-88 (emphasis added).

¶80  As provided by the consent decree, in a letter dated September 28, 2006, the Yakima Regional Clean Air Authority wrote New Tiger that "installation and operation of the Soil Vapor Extraction . . . system shall employ Best Available Control Technology." CP at 4590. And in a letter dated February 28, 2007, Ecology advised New Tiger:

> In accordance with Thurston County Consent Decree No. 02-2-00956-2 Section XXIII (B), Ecology hereby informs the Tiger Oil Corporation that the Best Available Control Technology . . . shall be used to control the emissions of toxic air pollutants from the remedial systems that have been installed at the [Site] in Yakima, Washington.

CP at 3912. With Ecology's approval, Yakima Regional Clean Air Authority's command that New Tiger use Best Available Control Technology became an "enforceable requirement[ ]" of the consent decree, which then, by operation of the above consent decree language, required New Tiger to use Best Available Control Technology on all soil vapor extraction systems in the Site.[66] CP at 3487. We hold

---

[66] Nevertheless, New Tiger argues that the consent decree limited Ecology's "ability to *add* requirements" under "two scenarios": (1) when Ecology discovers " 'factors or reasons that were not known at the time of this Decree' " and (2) when "the availability of new information regarding factors not known to Ecology that causes Ecology to believe further remedial action is necessary at the Site to address previously unknown threats." Reply Br. of Appellant at 7 (emphasis added and omitted) (quoting CP at 3480). In "support," New Tiger cites a consent decree section entitled "Reopeners," which addressed Ecology's authority to *enforce* New Tiger's *existing* obligations, not to *add new* obligations. The section that New Tiger

that Ecology did not act arbitrarily and capriciously by concluding that the consent decree and the cleanup action plan required New Tiger to use Best Available Control Technology with the soil vapor extraction technology at the Site.

## IV. TIMELY APPEALED APRIL 16, 2010 AMENDED CONTEMPT ORDER

¶81 New Tiger next argues that the superior court abused its discretion in entering the April 16, 2010 Amended Order of Contempt. New Tiger contends that (1) Ecology's contempt motions were procedurally improper because the motions fell outside the consent decree dispute resolution process; (2) the superior court erred by finding New Tiger in contempt for failing to operate the Interim SVE System because New Tiger's consent decree obligations were ambiguous and New Tiger did not intentionally disobey a court order; and (3) the superior court erred by finding New Tiger in contempt for failing to use Best Available Control Technology at the Site.[67] The first argument lacks merit. The third argument fails because, as we have earlier explained, the consent decree required New Tiger to use Best Available Control Technology and New Tiger failed to do so. Therefore, we affirm these parts of the superior court's amended contempt order.

¶82 But we find New Tiger's second argument persuasive: the facts, as presented in the record, do not establish that, by refusing to operate the Interim SVE System on the

cites does not pertain to the issue before us, which is Ecology's authority *to add new requirements* to the existing New Tiger consent decree conditions *See* CP at 3479.

[67] New Tiger also baldly asserts, "[C]ontempt was not appropriate given that New Tiger had cooperated with Ecology for years, before and after the consent decree and given the great strides it had made at the [S]ite." Br. of Appellant at 26. Because New Tiger fails to cite any legal authority supporting this contention and because the facts before us do not directly support this contention, we do not further address it. *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 771-72, 260 P.3d 967 (2011), *petition for review filed*, No. 86715-1 (Wash. Nov. 16, 2011).

Site, New Tiger intentionally violated a clear requirement of the New Tiger consent decree. Accordingly, we reverse this part of the superior court's amended contempt order.

## A. Standard of Review

¶83 We review contempt rulings for abuse of direction. *Trummel v. Mitchell*, 156 Wn.2d 653, 671-72, 131 P.3d 305 (2006). "An appellate court will uphold a trial court's contempt finding 'as long as a proper basis can be found.' " *Stella Sales, Inc. v. Johnson*, 97 Wn. App. 11, 20, 985 P.2d 391 (quoting *State v. Boatman*, 104 Wn.2d 44, 46, 700 P.2d 1152 (1985)), *review denied*, 139 Wn.2d 1012 (1999). "Contempt of court" includes any "intentional . . . [d]isobedience of any lawful . . . order . . . of the court." RCW 7.21.010(1)(b). If the superior court bases its contempt finding on a court order, "the order must be strictly construed in favor of the contemnor," *Stella Sales*, 97 Wn. App. at 20, and "[t]*he facts found must constitute a plain violation* of the order." *Johnston v. Beneficial Mgmt. Corp. of Am.*, 96 Wn.2d 708, 713, 638 P.2d 1201 (1982) (emphasis added).

## B. Contempt of Consent Decree

### 1. Contempt not outside consent decree dispute resolution process

¶84 New Tiger argues that the superior court abused its discretion in its amended contempt order because Ecology's second contempt motion was "outside the parties' agreed-upon dispute resolution process." Br. of Appellant at 24. New Tiger is mistaken. Although the consent decree dispute resolution process section did not specifically mention contempt proceedings, it did provide, "Where either Party utilizes the dispute resolution process in bad faith or for purposes of delay, the other Party may seek sanctions from this Court." CP at 3475. Contempt is such a court sanction. *See In re Marriage of Wagner*, 111 Wn. App. 9, 16, 44 P.3d 860 (2002).

¶85 New Tiger pursued, and exhausted, the consent decree dispute resolution process before Ecology moved for a contempt order on November 10, 2009. Accordingly, the superior court did not abuse its discretion by failing to deny the motion for a contempt order on grounds that Ecology had gone "outside the parties' agreed-upon dispute resolution process." Br. of Appellant at 24.

### 2. Failure to operate Interim SVE System

■ ¶86 New Tiger argues that the superior court abused its discretion in concluding that New Tiger was "in contempt [of Court] for failing to [comply with] the consent decree [by] ceas[ing to] operat[e] the [Interim SVE System]"[68] because "Ecology had already agreed that Mercy, not New Tiger, would operate the [Interim SVE System]." Br. of Appellant at 26. We agree with New Tiger.

¶87 The June 8, 2004 cleanup action plan, which was incorporated into New Tiger's October 29, 2004 consent decree, did not, *by its plain terms*, require New Tiger to operate the Interim SVE System. *In re Marriage of Humphreys*, 79 Wn. App. 596, 599, 902 P.2d 1012 (1995). Instead, the consent decree required New Tiger, if "free product" was present, to "install an SVE system" that was "to be connected to and become part of the vapor extraction system [that was] currently being used in the current interim remediation system." CP at 3508. In other words, although the New Tiger consent decree required New Tiger to *install* the New Tiger SVE Extensions in the Interim SVE System,[69] "strictly construed"[70] in favor of New Tiger, the New Tiger consent decree did not *clearly* designate New Tiger as the party responsible for *operating* the Interim SVE System.

---

[68] Br. of Appellant at 25 (citing CP at 5947).

[69] New Tiger apparently installed these New Tiger SVE Extensions in December 2004, although it is not clear whether New Tiger ever commenced operating them.

[70] *Stella Sales*, 97 Wn. App. at 20.

¶88 Furthermore, as New Tiger argues, it appears that the Mercy consent decree assigned to Mercy the obligation to operate the Interim SVE System, which further supports New Tiger's argument that it did not intentionally disobey the New Tiger consent decree by failing, or ceasing, to operate the Interim SVE System. The Mercy consent decree required Mercy to operate the Mercy SVE System for (1) 30 months following the completion of excavation operations; or (2) if excavation operations had not finished after 30 months following installation of the Mercy SVE Extensions, then for 30 months after the new Mercy SVE Extensions' installation. The Mercy consent decree defined the Mercy SVE System to include *both* "the SVE portion of the existing interim treatment system" (the Interim SVE System) and the Mercy SVE Extensions.[71] CP at 714. The Mercy consent decree permitted Ecology to choose another entity to operate the Mercy SVE System, but only after Mercy itself had first operated the Mercy SVE System for a 30-month period. The record before us does not show that Ecology had specifically transferred this obligation from Mercy to New Tiger.

¶89 In a September 30, 2008 letter, Ecology advised Mercy that "the [30-]month timeframe for installation has not started" and that "Ecology cannot confirm that Mercy has satisfied its obligations under the terms of the [Mercy consent decree]." CP at 5787. Thus, even if Mercy had installed the Mercy SVE Extensions the next day, October 1, then April 1, 2010 (30 months after October 1, 2008) would have been the earliest date that Mercy could have been free from its obligation to operate the Mercy SVE System.

---

[71] "[T]he Mercy [ ] SVE System shall consist of the SVE portion of the existing interim treatment system, the KMW-06 to Nob Hill SVE Extension to the north, the MW-9/MW-13 SVE Extension to the southeast and any connecting piping." CP at 714.

¶90 Yet only one day later, April 2, 2010,[72] the superior court held New Tiger in contempt for failing to operate the "SVE system," which the superior court defined as including *both* the New Tiger SVE Extensions and the Interim SVE System. Thus, to the extent that the superior court held New Tiger in contempt for failing to operate the Interim SVE System as of April 2, 2010, this ruling conflicted with the Mercy consent decree's requirement that Mercy, not New Tiger, operate the Interim SVE System as part of the Mercy SVE System for a 30-month period, which the record before us does not indicate happened.[73] We acknowledge the ambiguity about whether the New Tiger consent decree, therefore, required New Tiger to operate the Interim SVE System that the Mercy consent decree required Mercy to operate.[74]

¶91 But it is not for us to resolve these ambiguities on appeal from an order holding New Tiger in contempt for failure to operate the Interim SVE System, despite New Tiger's having operated it for a period of time and then ceasing. Instead, the narrow question before us is whether "[t]he facts . . . constitute a *plain violation*" of the New Tiger consent decree sufficient to support the superior court's holding New Tiger in contempt for failure to operate the

---

[72] The April 16 contempt order amendment did not affect this issue.

[73] The record shows only that on September 30, 2008, Ecology informed Mercy that the 30-month limit had not yet started to run.

[74] For example, it is undisputed that, whether New Tiger actually bore the legal responsibility to do so, (1) New Tiger operated the Interim SVE System until December 2006, more than three years after Mercy entered into the Mercy consent decree, which required Mercy to operate the same system; (2) the New Tiger cleanup action plan "specifie[d] the cleanup actions to take place at the Site," including "[c]ontinuing to operate and maintain the current interim remediation system," which included the Interim SVE System that the Mercy consent decree also ordered Mercy to install and to operate, CP at 3500; and (3) the New Tiger cleanup action plan stated, " 'The SVE system shall be engineered in such a way as to be connected to and become part of the vapor extraction system currently being used in the current interim remediation system.' " Br. of Resp't at 16 (emphasis omitted) (quoting CP at 3508). These undisputed facts, however, do not clearly show that New Tiger was responsible under the New Tiger consent decree for operating the Interim SVE System during the period for which the superior court held New Tiger in contempt for failure to do so.

Interim SVE System. *Johnston*, 96 Wn.2d at 713 (emphasis added).

¶92 We resolve in New Tiger's favor the ambiguities in the New Tiger consent decree, which by its plain language encompassed Mercy and other parties besides New Tiger, and the ambiguities in the Mercy consent decree, about who bore responsibility for operating the Interim SVE System. We hold that the record before us on appeal does not show that New Tiger committed a "plain violation" of the New Tiger consent decree and, therefore, does not support the superior court's finding New Tiger in contempt for failing to operate the Interim SVE System.[75] *Johnston*, 96 Wn.2d at 713. Accordingly, we reverse only that part of the April 16, 2010 amended contempt order finding New Tiger in contempt for failing to operate the interim SVE system.

### 3. Failure to use consent decree's required Best Available Control Technology

¶93 As we have already explained, the New Tiger consent decree required New Tiger to use Best Available Control Technology for the soil vapor extraction technology at the Site. A consent decree is a court judgment. *Wash. Asphalt*, 51 Wn.2d at 91. New Tiger's undisputed failure to use Best Available Control Technology was an intentional disobedience of the consent decree. RCW 7.21.010(1)(b). Accordingly, the superior court did not abuse its discretion by finding New Tiger in contempt for failing to use Best Available Control Technology at the Site as the consent decree required.

¶94 We affirm Ecology's final management review decision. We also affirm the superior court's April 2, 2010 order affirming Ecology's final management review decision and the superior court's April 2, 2010 order striking the letter exhibit from New Tiger's counsel's declaration. We affirm in

---

[75] We caution the parties not to read more into this narrow holding in the contempt context before us in this appeal.

part the superior court's April 16, 2010 amended contempt order, but we reverse that part of this order finding New Tiger in contempt for failing to operate the Interim SVE System.

ARMSTRONG and QUINN-BRINTNALL, JJ., concur.