# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 57672-4-II |
| ASHLEY ELIZABETH BURKS, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| TRENT NELSON, | |
| Appellant. | |

PRICE, J. — Trent Nelson appeals the superior court's order finding him in contempt for violating a protective order in his dissolution case with his ex-spouse, Ashley Burks.

The dissolution of Nelson and Burks' marriage was apparently acrimonious. Due to allegations of Nelson misusing Burks' financial information, the superior court issued a protective order to prevent the dissemination of her financial information. The protective order relied on Nelson's attorney, Rebekah Young, to monitor Nelson's access to the financial materials. But when Young later withdrew from Nelson's representation, the superior court issued an amended protective order that changed the procedures for protecting Burks' financial information.

At some point, Burks believed that both Nelson and Young had violated the original and amended protective orders. The superior court agreed with Burks, found Nelson and Young in contempt, and ordered them to pay Burks' attorney fees for bringing her contempt motion. Both Nelson and Young separately appeal.

In this appeal, Nelson argues that his conduct did not violate the superior court's protective orders.[1] Nelson also argues that even if his conduct did violate the protective order, Burks' motion was moot and he was not afforded the appropriate due process for the type of contempt Burks requested.

We reverse and hold that the superior court abused its discretion when it concluded that Nelson's conduct violated the superior court's protective orders.

FACTS

I. PROTECTIVE ORDERS

Burks initiated divorce proceedings to dissolve her marriage with Nelson in September 2021. Nelson retained Young to represent him.

The dissolution proceedings did not go smoothly. Burks was a local business person, and she became concerned that Nelson might misuse her business-related financial information disclosed during discovery. In February 2022, Burks moved for a protective order "prohibiting [Nelson] from using any information received through [] discovery for any other purpose than this proceeding" and that those materials be marked confidential. Clerk's Papers (CP) at 38.

In March, the superior court granted the motion and imposed a protective order. The March protective order required that materials designated as " 'Confidential' " (including business records like tax returns, bank records, and client and shareholder lists) "only be provided to a third party such as an expert witness or consultant or any other *legitimate* litigation support personnel."

---

[1] Young's appeal of the superior court's contempt order is the subject of a separate, linked appeal before us (No. 57679-1-II).

CP at 107-08 (emphasis added). The superior court also defined "legitimate" and described the procedure Nelson could use to access the confidential materials:

> "Legitimate" is defined as lawyers, staff for the lawyers and consulting experts. *Business records or confidential information described herein shall not be provided to Respondent. Respondent may view confidential materials in the presence of his attorneys at their office and shall not take images*.

CP at 108 (emphasis added). After the March protective order was in place and while she was still representing Nelson, Young was always with Nelson while he viewed the confidential materials.

But later that same month, Young and her law firm withdrew from representing Nelson. As a result of the loss of his lawyer, Nelson moved, pro se, to amend the March protective order. Nelson contended he needed an alternative method to view the confidential materials now that his former lawyer was no longer available to monitor his review of Burks' confidential materials. He requested an amendment to the procedure (italicized above), explaining,

> Removal of this clause is necessary now that I am proceeding with my case pro se. I no longer have attorneys, and thus, no means of access to Petitioner's discovery information. **Without access to Petitioner's discovery information, I am unable to conduct complete a [sic] thorough evaluation of Ms. Burks' discovery responses and our community assets.**

CP at 110.

Burks objected to Nelson's motion and advocated for a "special master to hold the discovery for [Nelson]." CP at 546.

In April, the superior court considered the motion to amend the March protective order. The superior court rejected Burks' request for a special master, but it agreed to modify the protective order. The superior court explained,

> My options are right now I do nothing or it stays the same. I modify it in some respect, which I may be inclined to modify in one limited respect, to tell you that you could view the documents that have been produced at your lawyer's office.

3

And if that requires you to pay for the time to do so, then you do that. Or you can, similarly, review the documents at [Burks' attorney's] office in her conference room without taking copies of images. *You can then take handwritten notes to do your compilations.* For that matter, *you can bring your laptop and create an Excel spreadsheet, without getting the actual hard copies for purposes of any reason*, *including losing control of the instruments that may be potentially disclosed to third parties*, inadvertently or not.

Also, to the extent that you retain a person that is qualified under Evidence Rule 700 series -- in other words, somebody that the Court would qualify as an expert, typically, if somebody with an accounting degree would like to evaluate the businesses or come to a book value, I will -- I'm inclined to modify the protective order and say that individual signs a verification that says that they will abide by the Court's protective order with consequences if they don't, including that of sanctions, that individual may have direct access to copies as well.

But I'm not going to modify it to allow unfettered access. I'm not going to modify the protective order. I will simply indicate that I would encourage you to re-think whether you should -- re-think the possibility of hiring counsel to be of some assistance. I appreciate that things are getting expensive, especially if you've paid $100,000 in a case such as this. I appreciate that concern. It's a concern that I hear often.

CP at 550-51 (emphasis added).

Nelson asked for clarification of where he could access the confidential materials and what notes he could take, and the following colloquy took place:

MR. NELSON: Before we move on, can I just seek some clarity on that -- you've mentioned that I can bring in my laptop if I need to transcribe and enter summary tables.

THE COURT: Yes. You may create your own notes. You may not take images.

MR. NELSON: Okay.

THE COURT: You may not take screenshots. You may review and digest the information that has been presented. You may take -- you may then take your notes and put them on a laptop. You may take handwritten notes in anticipation for preparation for your trial.

4

MR. NELSON: I would be more than willing to do that at my prior attorney's office. They would probably allow me to do that without a significant charge. I think the way that it was currently written is that I actually had a notepad -- they gave me a little notepad, and the notepad had to stay at the attorney's office. . . . I can't do anything with that. If we were able to adjust that --

THE COURT: Your notes -- well, I will tell you this, that if I find -- I will warn you that if I find that you have read a bank statement and you go out on April 3rd, 2022 and say she deposited "X" or she spent "Y" and that's disseminated to third parties, that violates my protective order.

In order to prepare for the trial, *I'm allowing you to take notes and create your spreadsheet* and the only audience will be me or a retained expert or a lawyer that represents you or [Burks' attorney].

CP at 552-53.

On April 22, 2022, the superior court entered its amended protective order. The April amended protective order was handwritten and short; it stated that the original March protective order would remain in full effect, except that:

Any CPA or business evaluation expert may receive confidential documents so long as they sign the protective order and agree to be held responsible for any violations thereof.

Mr. Nelson may view these documents in his prior attorney[']s office or in [Burks' attorney's] office but shall not take images of any kind (screenshot, photo, video) but he may take notes. Notes taken by Mr. Nelson shall be treated as confidential information and shall not be disseminated to third parties outside of attorneys of record, business valuation experts, CPA's or the court.

CP at 159-60.

II. NELSON'S FILE ACCESS AFTER THE APRIL AMENDED PROTECTIVE ORDER

After Young consulted with her colleagues on how to best abide by the two protective orders—the original March protective order and the April amended protective order—she stressed

to Nelson the importance of strictly following the orders and reminded Nelson multiple times about the requirements.

Nelson began viewing the materials at Young's office, although she was not usually in the room with him. Nelson initially used a computer provided by the law firm to view electronic versions of the materials. Young did not impose any procedures that would have prevented Nelson from copying Burks' confidential materials; Young merely relied on Nelson's word that he was not copying the materials in violation of the protective orders.

In May, Nelson hired a financial expert to assist in his case. To prepare documents for his expert, Nelson wished to use software programs that were not available on the office computers he previously used. So, thereafter, Nelson brought his personal laptop to Young's office and, with Young's cooperation, began to access Burks' financial information from a USB drive. Each time Nelson visited Young's office, he would receive the USB drive from Young and return it to her when he left.

Nelson used a software program on his laptop which created a spreadsheet from the financial materials. The data was extracted from documents on the USB drive, raw data was temporarily stored within the software's "transient memory" in a form that was not viewable, and the software created spreadsheets from the raw data. 2 Verbatim Rep. of Proc. (VRP) at 59. The spreadsheets were then saved directly to the USB drive, not Nelson's personal laptop. At that point, the software closed automatically and erased all transiently-saved data. When the process was completed, Nelson uploaded the spreadsheets created by the software directly from the USB drive to a private, online file-sharing drive that only his financial expert could access. Once the

files were uploaded for the expert, they were not available on the online file-sharing drive for Nelson to view or access.[2]

Nelson spent about 185 hours at Young's office during his review of the materials. Although Young was not in the same room with Nelson, she was always present at the office when he was there.

III. CONTEMPT PROCEEDINGS

In July 2022, after receiving information about what Nelson was doing in his review of her financial information, Burks filed a motion for contempt against Nelson and Young for violating the two protective orders. Burks alleged that the process of uploading confidential materials to Nelson's personal laptop and, from there, uploading those materials to an online file-sharing drive for his financial expert's review was a violation. Burks contended that the confidential materials were effectively copied when Nelson prepared spreadsheets of the data using the software and were, thereafter, freely available to him.[3]

On September 9, the superior court held an evidentiary hearing on the contempt motion. Both Nelson and Young testified consistently with the facts above. Nelson further explained that he never saved any materials to his personal laptop or a file-sharing drive that he could have thereafter accessed.

---

[2] We acknowledge that this description of the process is derived solely from Nelson's testimony. But the record contains nothing that refutes this description.

[3] Burks also alleged that Young was in contempt because she did not directly supervise Nelson's review of the confidential materials.

Two months after the evidentiary hearing, the superior court gave an oral ruling on Burks' motion, finding both Nelson and Young in contempt. The superior court explained that although Nelson wanted to remove the requirement that he could only view materials in "the presence of his attorneys" after Young withdrew, the superior court believed that requirement was still in place from the original March protective order. 3 VRP at 111. However, the superior court explained that the April amended order did allow for additional note-taking abilities for Nelson, stating,

> Ultimately, the Court did not modify the aforementioned restrictions in the protective order, but did allow Mr. Nelson to take notes and, from those notes, create a spreadsheet to assist him in preparing his case.

3 VRP at 113. The superior court also believed the amended order was clear about how Nelson should review the confidential materials and, critically, concluded that Nelson's review process violated the order:

> While the April 22, 2022 order is clear in all respects, the Court's verbal comments supplemented and were consistent with that order. In particular, the Court unambiguously stated: "You may create your own notes. You may not take images. You may not take screenshots. You may review and digest the information that has been presented. You may take handwritten notes in anticipation of preparation for trial."
>
> And later in the same colloquy, the Court again stated: "In order to prepare for trial, I'm allowing you to take notes and create your spreadsheet. . ."
>
> Now, based upon the undisputed testimony and evidence at the hearing, the Court has learned that Mr. Nelson was provided a thumb drive by Ms. Young containing the confidential information; that he took possession of the thumb drive and inserted the data from it onto his personal laptop computer; he cut and pasted the data and created a spreadsheet that was ultimately utilized in assisting his retained expert . . . and in his presentation of the case.

3 VRP at 113-14 (alternation in original).

Later, the superior court issued its written order, which largely restated its oral ruling. The order stated, in relevant part,

8

5.  After her withdrawal as counsel, Ms. Young no longer supervised Mr. Nelson['s] review of confidential information.

6.  Rather, Ms. Young provided Mr. Nelson with an unencrypted thumb drive with confidential documents for his unsupervised review in her office, which is no different than giving him hard copies except that it might be more readily available to disseminate.

7.  Mr. Nelson is a computer expert, *and his transference of the data from the thumb drive to his computer to copy the data to a spreadsheet was intentional, and it defied the Court's restrictive measures*, which did not . . . contemplate, *nor did it ever authorize this procedure used as a means to review and copying the data*, the confidential information.  *Rather, the court authorized separate notes and from those separate notes, the creation of a spreadsheet*.

. . . .

10.  Ms. Young and Mr. Nelson are in contempt of the March 16, 2022 Protective Order as well as the April 8, 2022 Order.

CP at 622-23 (emphasis added).

Nelson appeals.

## ANALYSIS

### I. CONTEMPT FINDING WAS AN ABUSE OF DISCRETION

Nelson argues that the superior court abused its discretion by finding him in contempt because his actions did not clearly violate the protective order.  We agree.

### A. LEGAL PRINCIPLES

We review the superior court's decision on a contempt motion for an abuse of discretion. *See, e.g.*, *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995).  An "abuse of discretion" is present if there is a clear showing that exercise of discretion was manifestly unreasonable or based on untenable grounds or reasons.  *Id.*

A court cannot hold a person in contempt for disobeying an order unless the facts constitute a "plain violation of the order." *Johnston v. Beneficial Mgmt. Corp. of Am.*, 96 Wn.2d 708, 713, 638 P.2d 1201 (1982). In contempt proceedings, courts strictly construe the language of the order that is the basis for the contempt motion in favor of an alleged contemnor. *Graves v. Duerden*, 51 Wn. App. 642, 647, 754 P.2d 1027 (1988); *Dep't of Ecology v. Tiger Oil Corp.*, 166 Wn. App. 720, 768, 271 P.3d 331 (2012). "The purpose for this rule is to protect persons from contempt proceedings based on violation of judicial decrees that are unclear or ambiguous, or that fail to explain precisely what must be done." *Graves*, 51 Wn. App. at 647-48.

B. APPLICATION

Nelson argues the superior court abused its discretion because, when strictly construing the language of the protective orders, Nelson's actions did not violate the orders. Nelson contends his creation of the spreadsheet was authorized and he did not transfer usable documents to his personal computer. He argues that his review process and the creation of the spreadsheets were narrowly designed to meet the specific language of the protective orders.

We analyze Nelson's position in four steps. First, we restate the precise language of the two protective orders. Second, we briefly restate and review the superior court's contempt order rationale to discern how it interpreted the language of its protective orders. Third, we apply a strict construction in favor of Nelson to the language of the protective orders to determine what was clearly prohibited and whether those prohibitions comported with the superior court's expectations. Finally, we compare those prohibitions of the orders (when strictly construed) with Nelson's conduct to determine whether he "plain[ly]" violated the orders. *See Johnston*, 96 Wn.2d at 713.

1. Protective Orders' Language

We begin with a close reading of the superior court's two protective orders. The original March protective order, entered when Nelson was represented by Young, allowed him to view the confidential materials "in the presence of his attorneys at their office" and essentially prevented him from making copies that would allow him to take the materials with him upon leaving. CP at 108. The specific language read:

> Business records or confidential information described herein shall not be provided to Respondent. Respondent may *view confidential materials in the presence of his attorneys* at their office and *shall not take images*.

CP at 108 (emphasis added). The short April amended protective order stated that the March protective order "shall remain in full force and effect," except it provided that Nelson could view the materials "in his prior attorney[']s office" and take notes. CP at 159-60. The specific language of the April amended protective order read:

> Mr. Nelson may view these documents in his prior attorney[']s office or in [Burks' attorney's] office but *shall not take images of any kind (screenshot, photo, video) but he may take notes*. Notes taken by Mr. Nelson shall be treated as confidential information and *shall not be disseminated to third parties* outside of attorneys of record, business valuation experts, CPA's or the court.

CP at 159-60 (emphasis added). And the superior court orally explained that under the amended protective order, Nelson would be allowed to create a spreadsheet:

> In order to prepare for the trial, *I'm allowing you to take notes and create your spreadsheet* and the only audience will be me or a retained expert or a lawyer that represents you or [Burks' attorney].

CP at 553.

11

2. Superior Court's Decision on Contempt

With this language in place, the superior court was apparently convinced that Nelson's electronic, unsupervised review of the materials violated the orders. The superior court also appeared to focus on Nelson's method for creating his spreadsheet. The superior court's written contempt order explained,

> 6. . . . Ms. Young provided Mr. Nelson with an unencrypted thumb drive with confidential documents for his unsupervised review in her office, which is no different than giving him hard copies except that it might be more readily available to disseminate.
>
> 7. Mr. Nelson is a computer expert, *and his transference of the data from the thumb drive to his computer to copy the data to a spreadsheet was intentional, and it defied the Court's restrictive measures*, which did not . . . contemplate, *nor did it ever authorize this procedure used as a means to review and copying the data*, the confidential information. *Rather, the court authorized separate notes and from those separate notes, the creation of a spreadsheet*.

CP at 622 (emphasis added).

The superior court appeared to believe that the spreadsheet was only authorized to be created from handwritten notes Nelson personally created, not using software on his personal computer, and that Nelson was not allowed to view the materials unsupervised. Thus, the superior court determined that Nelson's review method and spreadsheet creation violated the March protective order and the April amended protective order.

3. Construction of the Protective Orders

But contempt must be supported by strict construction of court orders in favor of alleged potential contemnors. *See Graves*, 51 Wn. App. at 647; *Tiger Oil Corp*., 166 Wn. App. at 768. Although the superior court characterized one of the orders as "clear in all respects," the two

12

protective orders collectively did not, on their faces, match the superior court's expectations. 3 VRP at 113.

The original March protective order prohibited Nelson from reviewing the materials outside the "presence" of his attorneys and from taking "images" of any materials. CP at 108 ("Respondent may view confidential materials in the presence of his attorneys at their office and shall not take images."). The order did not specify what form Nelson must view the materials in (electronic or printed copies), nor did it specify how Nelson must take notes. The April amended order reiterated the requirement that Nelson could not make copies or take images ("Mr. Nelson . . . shall not take images of any kind (screenshot, photo, video) . . . ."), but it, too, was silent about what form of document viewing Nelson was required to use. CP at 160.

As for notetaking, the April amended order permitted Nelson to "take notes," but it contained no limitation on the form of which the notes must have been taken—there was no reference to electronic or handwritten notes. The only specific requirement relevant to Nelson's notetaking was that he was prohibited from sending any confidential materials or notes to third parties other than his hired experts. CP at 159-60 ("Notes taken by Mr. Nelson shall be treated as confidential information and shall not be disseminated to third parties . . . .").

The April amended order made no mention of "spreadsheets," but the superior court's oral comments showed the superior court expected spreadsheets to be permitted. The superior court explained that Nelson would be permitted to create a spreadsheet, specifically stating Nelson could "take notes and create [his] spreadsheet." CP at 553. But, again, there was no specificity about the form permitted for the spreadsheets or how it must be created.

Finally, regarding being unsupervised, the April amended order shifted the requirement from the original March protective order that Nelson review the materials in the "presence" of his attorneys to just being "in his prior attorney[']s office." CP at 160 ("Nelson may view these materials in his prior attorney[']s office or in [Burks' attorney's] office . . . .").

Thus, when properly construed strictly in favor of Nelson, the language of the two protective orders did not reflect the expansive prohibitions that were applied by the superior court in its contempt order. *See Graves*, 51 Wn. App. at 647-48 (alleged contemnors are protected from contempt proceedings based on orders that are "unclear or ambiguous, or that fail to explain precisely what must be done"); *Tiger Oil Corp.*, 166 Wn. App. at 768 (order must be construed in favor of the alleged contemnor).

4. Nelson's Actions Did Not Violate the Protective Orders

As our last step, we compare Nelson's review and spreadsheet-creating process with the prohibitions of the two protective orders (strictly construed). After the imposition of the April amended protective order, Nelson could not copy "images" but could take notes and create spreadsheets and share those spreadsheets with an expert; nothing dictated the method of the note-taking or form of the spreadsheets. Nelson was required to be located in his former attorney's office; nothing required Young to be in the room with Nelson. Thus, Nelson's conduct complied with these prohibitions—he only viewed the confidential materials at Young's office, and never saved copies or images of the materials to his personal computer or any file-sharing drives that he would be able to access later.

It is true that Nelson's creation of spreadsheets using the software located on his computer pushed the boundaries of what was permitted on the face of the protective orders. But even these

spreadsheets fell short of violating the protective orders (strictly construed). Nelson's software created the spreadsheets by using the data from documents on the USB drive, extracting the data, temporarily, transiently storing it in a raw form—not in a usable form that Nelson could view— and terminating the data upon creation of the final spreadsheet product. That spreadsheet was then saved directly on the USB drive. Thus, no "image" was ever stored on Nelson's personal laptop. The only data was raw data that was not usable and whose presence was merely temporary; this raw data was not akin to taking an image for use outside of Young's office at a later time.

Thereafter, Nelson uploaded his spreadsheet to a file-sharing drive for his expert. The spreadsheet was uploaded directly from the USB drive and only the expert could access the spreadsheets after they were uploaded; Nelson had no further access to the spreadsheet after uploading the spreadsheet and leaving Young's office. Because Nelson did not create a pathway to access the confidential materials outside Young's office, neither the use of the software program nor the sharing of the spreadsheets with the expert was a violation of the protective orders (strictly construed).[4]

To be sure, Nelson's use of technology did not comport with the superior court's subjective view of what it ordered. It is apparent the superior court intended for Nelson to only access the materials and take notes in a nonelectronic manner. And the superior court also appears to have

---

[4] The superior court appeared to view Nelson's use of the software as actually transferring data *onto his computer* to create the spreadsheet *on his computer*. We view the facts in the record differently. But even if the superior court did not believe Nelson's testimony about how the software program worked, there remains no evidence in the record that Nelson actually made accessible copies of the confidential materials on his laptop during the process of creating the spreadsheets.

expected that Nelson would be supervised. Frustration is understandable when the superior court's subjective intentions were not followed, especially when those intentions were rooted in a justifiable concern for wrongful dissemination of sensitive information. And one might imagine a detailed protective order that would reasonably impose the requirements intended by the superior court.

But the specific language of these two protective orders, when properly construed strictly in favor of Nelson, do not match those intentions. Because Nelson's actions did not "plain[ly]" violate the restrictions in the protective orders, the superior court abused its discretion by finding Nelson in contempt. *See Johnston*, 96 Wn.2d at 713.[5]

II. ATTORNEY FEES

Both Burks and Nelson request attorney fees for this appeal. Burks requests attorney fees for this appeal under RAP 18.1(a) and RCW 7.21.030(3). RAP 18.1(a) allows us to award attorney fees if applicable law allows. And RCW 7.21.030(3) allows courts to award attorney fees when a person has been found in contempt of court. Because we reverse the order finding Nelson in contempt, we deny Burks' request for attorney fees; no contempt remains to justify the award.

Nelson requests attorney fees under RCW 26.09.140. Pertaining to dissolution proceedings, the statute allows an appellate court to, "in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees." RCW 26.09.140. In determining whether to award attorney fees under the statute, "[w]e may 'consider the arguable

---

[5] Nelson also argues, in the alternative, that the superior court erred in determining Burks' motion for contempt was not moot and that he was not afforded the appropriate due process for the type of contempt Burks requested. Because we reverse on other grounds, we do not address these arguments.

No. 57672-4-II

merit of the issues on appeal and the parties' financial resources.' " *In re Marriage of Lesinski & Mienko*, 21 Wn. App. 2d 501, 518, 506 P.3d 1277 (2022) (quoting *In re Marriage of C.M.C.*, 87 Wn. App. 84, 89, 940 P.2d 669 (1997)); RCW 26.09.140. Nelson argues we should award him attorney fees because Burks' financial resources "far outweigh" his own. Br. of Appellant at 38. After considering Nelson's recently-filed declaration of his financial resources, we decline to award attorney fees to Nelson on appeal.

CONCLUSION

We reverse, holding that the superior court abused its discretion in finding Nelson in contempt when his actions did not violate the requirements of the protective orders.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, A.C.J.

L_____, J.

17